UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
BEAR, STEARNS FUNDING, INC.,              :
                                          :               03 Civ. 8259 (CSH)
                        Plaintiff,        :
                                          :
          -against-                       :          MEMORANDUM OPINION
_____ :              AND ORDER
INTERFACE GROUP-NEVADA, INC.,             :
                                          :
                        Defendant.        :
------------------------------------------------------------- x

HAIGHT, Senior District Judge:

      This diversity action arises out of a loan agreement between Bear, Stearns Funding, Inc.

("Bear Stearns") and Interface Group-Nevada, Inc. ("Interface").  Bear Stearns claims that Interface

breached the agreement by failing to make a $1,477,992 payment—an adjustment between estimated

and actual transaction figures—upon Bear Stearns' final disposition of the loan.  Interface does not

dispute that the contract required an adjustment payment, nor does it challenge the accuracy of the

calculated figure.  Nor is there any dispute that Interface failed to make the payment.  Rather, the

issue is whether Bear Stearns' entitlement to the adjustment payment was extinguished or offset by

Bear Stearns' *own* breaches of the contract.

      Specifically, Interface contends that it was excused from making the payment because Bear

Stearns materially breached the contract by selling a portion of the loan to a competitor of Interface,

failing to obtain confidentiality agreements to protect Interface's financial information, failing to

make good faith efforts to obtain a market price for the loan, and failing to make good faith efforts

to restrict the purchaser of the loan from selling it to a competitor of Interface.  Interface advances

counterclaims on these grounds, and further counterclaims that Bear Stearns breached its implied

covenant of good faith and fair dealing by pressuring Interface to purchase terrorism insurance.

The parties have filed cross-motions for summary judgment.  Bear Stearns moves for summary judgment on its claim and on Interface's counterclaims, while Interface moves for summary judgment on Bear Stearns' claim.

## I.  BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Bear Stearns, a Delaware corporation with its principal place of business in New York, is an investment banking and securities brokerage firm that, among other things, extends loans to clients secured by liens on real property.  Bear Stearns then treats the loans as commodities and sells, issues participations in, securitizes, or otherwise transfers its interest in those loans to third parties or into capital markets.

Interface, a Nevada corporation with its principal place of business in Nevada, is the wholly-owned subsidiary of a holding company controlled by Sheldon G. Adelson.  Interface owns and operates the Sands Expo and Convention Center (the "Sands"), located in Las Vegas, Nevada.  The Sands is the largest privately owned convention center in the United States.  Through his corporate affiliates, Adelson also owns the Venetian Casino Resort and Hotel (the "Venetian") and the Grand Canal Shops Mall (the "Shops Mall"), which are physically linked to the Sands.  In this opinion, I refer to the entities that own the Sands, the Venetian, and the Shops Mall as the "Venetian Affiliates."

#### 2.    The Loan Agreement (and Associated Side Agreements)

On June 28, 2001, the parties entered into an agreement (the "Loan Agreement"), pursuant to which Bear Stearns loaned $141 million to Interface, secured by a mortgage encumbering the

Sands.  I review several relevant features of the Loan Agreement.

The agreement permits Bear Stearns to sell, issue participations in, or securitize all or part of the loan.  Section 9.1 of the Loan Agreement acknowledges these disposition options, and defines the term "Securitization":

> **Section 9.1.  <u>Sales of Notes and Securitization</u>.**  Borrower acknowledges and agrees that Lender may sell all or any portion of the Loan and the Loan Documents, or issue one (1) or more participations therein, or consummate one (1) or more private or public securitizations of rated single- or multi-class securities (the "<u>Securities</u>") secured by or evidencing ownership interests in all or any portion of the Loan and the Loan Documents or a pool of assets that include the Loan and Loan Documents (such sales, participations and/or securitizations, collectively, a "<u>Securitization</u>").  . . .

Affidavit of Jonathan M. Hoff, dated July 31, 2006 ("July Hoff Aff."), Ex. 15, § 9.1.

However, Bear Stearns' assignment rights are not unrestricted.  Section 10.24 of the Loan Agreement prevents Bear Stearns from assigning the loan to a competitor of Interface (the "Competitor Restriction").  But Section 10.24 also provides that the Competitor Restriction "shall not apply to a Securitization of the Loan and shall be void and of no further force and effect after a Securitization of the Loan" (the "Securitization Exemption").  Section 10.24 states:

> **Section 10.24.  <u>Limitations on Lender's Assignment Rights</u>.**  Unless an Event of Default shall then exist, Lender shall not consummate an assignment or a participation to any Person that then (i) owns or operates (or is an Affiliate of a Person that owns or operates) a casino that is located in the State of Nevada or the State of New Jersey, (ii) owns or operates (or is an Affiliate of a Person that owns or operates) a Competing Facility and /or (iii) is a union pension fund (any such Person, a **"**<u>Competitor</u>") . . . . Notwithstanding the foregoing, this Section shall not apply to a Securitization of the Loan and shall be void and of no further force and effect after a Securitization of the Loan.

July Hoff Aff., Ex. 15, § 10.24.

The agreement also includes a confidentiality provision that protects the financial information

of Interface and Adelson.  Section 10.25 of the Loan Agreement requires Bear Stearns to protect the personal financial information of Adelson and to "use commercially reasonable efforts to require confidentiality agreements to be signed prior to the release" of Interface's financial information to third parties—except that this obligation does not apply "in connection with a Securitization."  July Hoff Aff., Ex. 15, § 10.25.

The interest rate for the loan was a floating rate, expressed as a "spread" above the London Interbank Offered Rate ("LIBOR").  The spread for the loan was initially set at 400 basis points, or 4.00%, above LIBOR.   The Original Sharing Agreement, a side agreement executed contemporaneously with the Loan Agreement, provided that upon Bear Stearns' final disposition of the entire loan, the spread for Interface would be modified to a "Reset Spread" based on the overall spread at which Bear Stearns was able to dispose of the loan.  Under the agreement, if Bear Stearns was able to obtain an overall spread below 400 basis points, Interface's interest rate would be reduced in the following way.  Interface would gain the full benefit of the first 50 basis points of saving (or any yield between 350 and 400 basis points), and Interface would share equally with Bear Stearns in the benefits of the overall spread below 350 basis points.  If the overall spread exceeded 400 basis points, the spread would remain capped at 400 basis points for Interface.[1]  *See* Affidavit of Ronald Schneider, dated July 31, 2006 ("Schneider Aff."), Ex. 3.

---

[1] Several examples can illustrate this formula.  If Bear Stearns disposed of the loan at an overall spread of 420 basis points, Interface's spread would remain at 400 basis points.  If Bear Stearns disposed of the loan at an overall spread of 360 basis points, Interface would gain the full benefit of the 40 basis point reduction from the original 400, and the Reset Spread would be 360 basis points.  If Bear Stearns disposed of the loan at an overall spread of 310 basis points (a 90 basis point reduction from the original 400), Interface would gain the full benefit of the first 50 basis point reduction and half of the benefit of the remaining 40 basis point reduction, for a total benefit of a 70 basis point reduction, and an effective Reset Spread of 330 basis points.

4

The Original Sharing Agreement, in Section 1, states that Bear Stearns' re-sizing of components of the loan should reflect an "interest rate equal to the rate required by the market for a par sale of each component." Schneider Aff., Ex. 3. Section 1 further states that "Lender shall use commercially reasonable efforts to achieve a Securitization which results in the lowest Spread possible which does not compromise Lender's right to securitize the Loan." *Id.*

Another side agreement, the Post-Closing Cooperation Agreement, provided that Interface would promptly pay the disposition costs, defined as "the costs of Securitization," incurred by Bear Stearns. July Hoff Aff., Ex. 22, at 3.

### 3.      The Revised Sharing Agreement

In August 2002, Bear Stearns anticipated that it would soon achieve a final disposition of the Sands loan. Bear Stearns had divided the $141 million loan into two pieces, an investment grade senior component (of about $107 million of the loan) and a non-investment grade subordinate component (of about $34 million of the loan). The senior component was to be transferred to a trust, consisting of a pool of interests derived from a number of commercial mortgage loans, which would issue investment grade-rated certificates (the "Senior Securitization Transaction"). The subordinate component was to be sold in a private placement (the "Subordinate Transaction"). At the time, Bear Stearns believed it had a commitment from Beal Capital Markets ("Beal") to purchase the subordinate component.

In anticipation of these transactions, Bear Stearns and Interface entered into a new side agreement, the Revised Sharing Agreement, dated August 13, 2002, which superseded the Original Sharing Agreement and the Post-Closing Cooperation Agreement. The Revised Sharing Agreement addressed the Reset Spread and disposition costs, as well as issues relating to the Competitor

Restriction and the sale of the subordinate component.

The Revised Sharing Agreement provided that, upon the closing of the Senior Securitization Transaction, the Reset Spread would be set at 344 basis points above LIBOR.  This figure was calculated based on estimated yields and disposition costs from the anticipated senior and subordinate transactions.  The parties agreed that, upon final disposition, Bear Stearns would recalculate the Reset Spread based on actual yields and disposition costs from the transactions.  Under the Revised Sharing Agreement, Interface would pay the calculated difference in cash to Bear Stearns if the initial estimates were too low, and Bear Stearns would pay the calculated difference in cash to Interface if the initial estimates were too high (the "True-Up Payment").  *See* Schneider Aff., Ex. 16, § 5.

Section 3 of the Revised Sharing Agreement contains several provisions relating to the Competitor Restriction and sale of the subordinate component.  Section 3 acknowledged that Bear Stearns did not accept Interface's request to modify the Competitor Restriction in the Loan Agreement by removing the Securitization Exemption:

> Borrower has requested that Lender modify Section 10.24 of the Loan Agreement to restrict the right of Lender or other holders of an interest in the Loan to sell, assign or otherwise transfer such interests to any [Competitor of Interface] by deleting the last sentence of Section 10.24 of the Loan Agreement.  . . . Lender has not accepted the request of Borrower . . . .

Schneider Aff., Ex. 16, § 3.[2]  The Revised Sharing Agreement also provides that if Beal purchased the subordinate component, Beal would be required to agree "not to further sell, assign or otherwise

_____

[2] The last sentence of Section 10.24 is the Securitization Exemption, which states: "Notwithstanding the foregoing, this Section shall not apply to a Securitization of the Loan and shall be void and of no further force and effect after a Securitization of the Loan."  July Hoff. Aff., Ex. 15, § 10.24.

transfer its interest in the Subordinate Component to a Competitor" (the "Subordinate Component Restriction") without the prior consent of Interface.  *Id.*  But if the sale to Beal was not accomplished, Bear Stearns was not required to sell the subordinate component subject to the Subordinate Component Restriction.  *Id.* (if the sale to Beal does not occur, "there can be no assurances" that the purchaser would accept the Subordinate Component Restriction and "Lender makes no representation or warranty to Borrower that the Subordinate Component will be subject to the Subordinate Component Restriction").  However, Bear Stearns was required to make good faith efforts to sell the subordinate component subject to the Subordinate Component Restriction, provided that the restriction did not adversely affect Bear Stearns' ability to dispose of the loan. Section 3 states:

> Lender shall in good faith use diligent efforts to market and sell the Subordinate Component subject to the Subordinate Component Restriction provided that Lender reasonably determines (such determination to be made in its sole discretion, made in good faith) that selling the Subordinate Component subject to the Subordinate Component Restriction will not adversely affect Lender's ability to sell or otherwise dispose of 100% of Lender's interest in the Loan.

*Id.*  Section 3 further states that "[n]othing contained herein shall be construed to permit Lender to transfer the Loan or any portion thereof in violation of the provisions of Section 10.24 of the Loan Agreement."  *Id.*

### 4.   Bear Stearns' Disposition of the Loan

The Senior Securitization Transaction successfully closed in August 2002, and in accordance with the Revised Sharing Agreement, the Reset Spread was set at 344 basis points.  However, the expected sale of the subordinate component to Beal did not occur.  Bear Stearns claims that Beal inexplicably withdrew from a commitment to purchase the subordinate component—at a price level

where Beal could achieve a yield (or discount margin) of 900 basis points above LIBOR—just prior to the closing of the transaction.[3]  According to Interface, however, Bear Stearns refused to negotiate with Beal to reach a compromise price for the subordinate component to punish Beal for withdrawing from another investment, the DMARC bonds, offered by Bear Stearns around the same time.  Bear Stearns contends that it continued to negotiate with Beal until November 2002, when Beal offered to purchase the subordinate component at 90% of par, which Bear Stearns considered to be an unreasonably low price.[4]

After the expected transaction with Beal fell through, Bear Stearns continued its efforts to sell the subordinate component but had difficulty finding a purchaser.  Bear Stearns attributes these difficulties to a lack of market interest, while Interface contends that Bear Stearns' marketing and sales efforts were deficient.  Eventually, Bear Stearns enlisted the assistance of a third-party intermediary, Robert Cestari.  In May 2003, Cestari connected Bear Stearns with Starwood Capital,

---

[3] Bear Stearns explains that the "price" for the subordinate component can be expressed either in terms of: (1) a price, as a percentage of par value, or (2) yield to the investor, in terms of a discount margin.  The yield level must typically be considered with reference to assumptions about the term (or maturity date) of the loan.  For example, a given discount margin assuming maturity of the loan in one year equates to a lower discount margin assuming maturity of the loan in two years.  This is because the cash flows generated from the loan are spread over a longer period of time in the latter case.  *See* Bear Stearns' Opp'n Br. 10 n.5; Affidavit of Randy Reiff, dated November 6, 2006 ("Nov. Reiff Aff."), ¶¶ 3-5.  The price as a percentage of par value and the yield to the investor are inversely related—in other words, a higher percentage of par value corresponds to a lower discount margin.  Finally, a higher price (lower discount margin) would produce more favorable loan terms for Interface.

[4] During the November 2002 discussions, Beal also requested a 90-day period of exclusive review before closing the transaction (during which Bear Stearns could not market the subordinate component to other purchasers).  Bear Stearns considered this request unreasonable because Beal had already completed its due diligence in August 2002 in connection with the prior discussions about purchasing the subordinate component.

8

which expressed interest in purchasing the subordinate component.[5]  Starwood Capital took a site tour of the Sands and obtained information from Interface as part of its diligence activities in connection with the potential purchase.

Throughout June and July 2003, Bear Stearns and Starwood Capital negotiated the terms of the sale of the subordinate component.  On July 21, 2003, Bear Stearns sold the subordinate component to SOF-VI Bond Corp. ("SOF-VI"), a fund managed by Starwood Capital, at a price of 94.97% of par.  This price reflected a yield of 1265 basis points above LIBOR, assuming no extension of the initial maturity date of the Loan.  Starwood Capital refused to accept the Subordinate Component Restriction as part of the purchase.

### 5.      Interface Refuses To Make True-Up Payment

By letter dated July 30, 2003, Bear Stearns advised Interface that final disposition of the loan had occurred.  In accordance with the formula set forth in the Revised Sharing Agreement, Bear Stearns calculated the True-Up Payment based on actual—rather than estimated—yields and disposition costs, and determined that Interface owed it $1,477,992.[6]  Interface, however, refused to pay the requested amount.  It contended that Bear Stearns had improperly sold the subordinate component to a competitor because of SOF-VI's affiliation with Starwood Hotels & Resorts ("Starwood Hotels"), which Interface claimed owned the Westin Casuarina Hotel & Spa (the "Westin Casuarina") and the Aladdin Hotel & Casino (the "Aladdin"), both located in Las Vegas, Nevada.

---

[5] Starwood Capital had engaged in a number of transactions with Bear Stearns in the past.

[6] Interface does not dispute the mathematical calculation of the True-Up Payment.

### 6.      The Venetian Refinancing

Interface argues that the dispute between the parties is related to a separate transaction—a 2002 refinancing of debt for the Venetian, another Adelson property (the "Venetian Refinancing"). Bear Stearns had hoped that the Sands Loan would lead to participation in the Venetian Refinancing, and initially Bear Stearns was in fact included in that deal.  However, Bear Stearns was dismissed from the transaction around April 19, 2002 after it delivered a term sheet to Adelson proposing higher prices than had previously been agreed to.  Adelson believed that Bear Stearns had improperly attempted to raise the fees that it and other banks were charging, while Bear Stearns claimed the term sheet had been mistakenly revised and delivered by a junior banker, acting beyond his authority and contrary to instructions from his superiors.

On May 15, 2002, Bear Stearns' CEO James Cayne called Adelson in an unsuccessful attempt to have Bear Stearns allowed back into the Venetian refinancing.  Interface alleges that during this conversation (and a conversation shortly thereafter with David Friedman, Interface's general counsel), Cayne threatened to call the Sands loan in default, do whatever Bear Stearns could to hurt Interface, and make life difficult for Interface unless Bear Stearns was reinstated into the Venetian refinancing.  *See* Interface's Statement of Additional Material Facts in Opp'n to Pl.'s Mot. for Summ. J., ¶ 64.  Bear Stearns contends that Cayne told Adelson that Bear Stearns had deferred from sending a notice of default due to lack of terrorism insurance for the Sands because it valued the client relationship between Bear Stearns and the Venetian Affiliates, but that Bear Stearns would deal with Interface on an arm's length basis (as if there was no institutional relationship between the parties) if Bear Stearns was not reinstated into the Venetian refinancing.  *See* Bear Stearns' Response to Interface's Statement of Additional Material Facts in Opp'n to Pl.'s Mot. for Summ. J., ¶ 62, ¶

10

64. Adelson refused to allow Bear Stearns back into the Venetian refinancing deal.

**7.  Terrorism Insurance**

Under Section 6.1(a)(i) of the Loan Agreement, Interface was obligated to maintain "all risk" insurance for the Sands.  Section 6.1 also required Interface to obtain "upon sixty (60) days written notice, such other reasonable insurance . . ., and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located."  July Hoff Aff., Ex. 15, § 6.1(a)(ix).  Section 6.1(f) granted Bear Stearns the right to "force-purchase" insurance if "at any time Lender is not in receipt of written evidence" of insurance required under the Loan Agreement.

All-risk insurance policies cover all risks of loss unless excluded or limited by the policy's terms and conditions.  Prior to 9/11, Interface's all-risk insurance covered damage due to acts of terrorism.  After 9/11, however, many—and perhaps nearly all—all-risk policies excluded such losses from coverage.  When Interface renewed its property insurance in April 2002, its all-risk policy excluded damage due to acts of terrorism.

Although many all-risk policies excluded damages from acts of terrorism, borrowers could obtain separate terrorism insurance policies.  Bear Stearns states that its general policy was to require terrorism insurance coverage on all its financed assets securing large commercial loans, and contends that other major lenders and servicers—such as GMAC, Wells Fargo, and Goldman Sachs—similarly required terrorism insurance to be obtained by their borrowers on large loans.  *See* Pl.'s Statement of Undisputed Material Facts, ¶¶ 145-47.  Interface argues that terrorism insurance may have been  required by some lenders as a condition for new loans, but that terrorism insurance

11

coverage was generally not obtained when insurance policies were renewed for existing loans.  *See* Interface's Response to Pl.'s Statement of Undisputed Material Facts, ¶ 145.

Around March 2002, the Venetian Affiliates and Goldman Sachs were negotiating the terms of a $120 million financing of the Shops Mall (the "Shops Mall Loan").[7]  In connection with this loan, Goldman Sachs asked the Venetian Affiliates to obtain $200 million in terrorism insurance coverage for the Shops Mall, including losses due to business interruption at the Shops Mall if any of the Venetian properties were damaged by a terrorist attack.[8]  As a result, the Venetian Affiliates purchased blanket terrorism insurance covering the Shops Mall, the Sands, and the Venetian.  On or about April 25, 2002, the Venetian Affiliates purchased a $100 million blanket terrorism insurance policy for the Venetian properties.  The Venetian Affiliates purchased an additional $5 million policy on May 7, 2002, and an additional $95 million in blanket terrorism coverage on May 10, 2002—for a total of $200 million in blanket terrorism coverage for the Venetian properties by May 10, 2002.[9]  *See* Pl.'s Statement of Undisputed Material Facts, ¶¶ 155-59; Interface's Response to Pl.'s Statement of Undisputed Material Facts, ¶¶ 155-59.

In March 2002, Bear Stearns began making inquiries with Interface about terrorism insurance coverage for the Sands.  Between April 17, 2002 and May 10, 2002, Bear Stearns and Interface (and

---

[7] The principal amount of the loan was initially $105 million, but was ultimately increased to $120 million.

[8] Because the Venetian properties are physically and economically connected, the Shops Mall could suffer business interruption due to a terrorist attack on the Sands or the Venetian, even if the Shops Mall itself did not incur any property damage.

[9] Interface notes that Goldman Sachs initially requested $200 million in terrorism insurance coverage, but ultimately settled for $120 million in coverage for the principal amount of the Shops Mall Loan.

their insurance consultants) had several discussions about terrorism coverage for the Sands. During these discussions, Interface did not tell Bear Stearns about the $200 million in blanket terrorism coverage for the Venetian properties that it had purchased upon Goldman Sachs' request.

On May 16, 2002, the day after Cayne's unsuccessful attempt to persuade Adelson to allow Bear Stearns back into the Venetian financing, Bear Stearns sent Interface a letter informing Interface that it was required to purchase terrorism insurance under the terms of the Loan Agreement and that failure to purchase such insurance would constitute a default under the Loan Agreement. In a response letter dated May 16, 2002, Interface argued that the Loan Agreement did not require terrorism insurance for the Sands, but also informed Bear Stearns that it had purchased $200 million in blanket terrorism insurance coverage for the Venetian properties, including the Sands. By letter to Interface dated May 20, 2002, Bear Stearns again argued that the Loan Agreement required terrorism insurance for the Sands and stated that it would review the "limited [insurance] policies you have obtained and will notify you of our opinion as soon as possible." July Hoff Aff., Ex. 42.

Interface purchased an additional $45 million in terrorism insurance coverage for the Venetian properties on May 23, 2002, and an additional $11.5 million on June 28, 2002. Interface asserts that this additional $56.5 million in terrorism insurance was purchased as a result of Bear Stearns' demands, while Bear Stearns argues that this additional coverage was related to Goldman Sachs and the Shops Mall Loan.

On June 27, 2002, Bear Stearns wrote to Interface and stated that the purchased terrorism insurance coverage did not appear to meet the requirements of the Loan Agreement because the coverage was not specifically allocated to the Sands. On July 1, 2004, Interface informed Bear Stearns that the Venetian Affiliates had established a priority of distribution of insurance proceeds

from any terrorism insurance payout that placed the Sands second in line, behind the Shops Mall. After reviewing the form and structure of the terrorism insurance coverage, Bear Stearns determined that the terrorism insurance scheme was acceptable and did not call a default.

The total amount of premiums paid by the Venetian Affiliates for the $256.5 million in terrorism insurance coverage for the Venetian properties was $1.898 million. Interface paid only $162,000 for the Sands' share of the terrorism insurance premiums, which took into account the fact that Mr. Friedman had persuaded Goldman Sachs to reduce its fees for the Venetian Refinancing by $500,000 in light of the high cost of terrorism insurance premiums, including for the Sands.

**B.    Procedural History**

On October 17, 2003, Bear Stearns filed suit in this Court alleging that Interface had breached the contract by refusing to make the $1,477,992 True-Up Payment. Interface filed an answer and counterclaims on December 2, 2003, in which it argued that the True-Up Payment was excused by Bear Stearns' sale of the subordinate component to a competitor. In addition, Interface asserted six counterclaims, alleging: (1) breach of the Loan Agreement, (2) breach of the Revised Sharing Agreement, (3) breach of the duty of good faith and fair dealing, (4) misappropriation of trade secrets, (5) prima facie tort, and (6) fraud.

On February 20, 2004, Bear Stearns moved for summary judgment on its breach of contract claim and to dismiss certain of Interface's counterclaims. In a March 21, 2005 Opinion, the Court denied Bear Stearns' summary judgment motion on the grounds that genuine issues of material fact remained as to whether Bear Stearns had breached the contract by failing to make diligent, good faith efforts to sell the subordinate component with the Subordinate Component Restriction, and whether such a breach was a material breach of the contract. The Court granted Bear Stearns' motion to

dismiss part of Interface's Third Counterclaim (for breach of the duty of good faith and fair dealing) and all of Interface's Fourth through Sixth Counterclaims (for misappropriation of trade secrets, prima facie tort, and fraud), on the grounds that such claims were duplicative of Interface's breach of contracts claims or otherwise inadequately pleaded.  The Court denied Bear Stearns' motion to dismiss the Third Counterclaim, for breach of the duty of good faith and fair dealing, to the extent that the claim was based on allegations that Bear Stearns had improperly demanded that Interface purchase terrorism insurance.  *See Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283 (S.D.N.Y. 2005) ("*Bear Stearns I*").

Following extensive fact and expert discovery, both parties now move for summary judgment.  Bear Stearns moves for summary judgment on its breach of contract claim and all of Interface's remaining counterclaims.  Interface moves for summary judgment dismissing Bear Stearns' claim on the grounds that Bear Stearns materially breached the contract by failing to use good faith efforts to obtain a market price for the subordinate component, and by failing to use diligent, good faith efforts to sell the subordinate component subject to the Subordinate Component Restriction.

## II.  DISCUSSION

### A.    Standard of Review on Motions for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law governing the case will identify which facts are material and "[o]nly disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In this case, the Loan Agreement and the Revised Sharing Agreement provide that New York law governs the present dispute.

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).   However, "mere conclusory allegations, speculation or conjecture" are insufficient for a non-moving party to resist summary judgment.  *Cifarelli v. Vill. of Bablyon*, 93 F.3d 47, 51 (2d Cir. 1996).

When cross-motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment."  *Natural Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003).  "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party."  *Id.* (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

The court may grant a motion for summary judgment in part and deny it in part.  *See* Fed. R. Civ. P. 56(d).

**B.      Summary of Legal Claims**

**1.      Bear Stearns' Breach of Contract Claim**

"Under New York law, an action for breach of contract requires proof of (1) a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages." *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (quotations and citations omitted).  In the case at bar, there is no dispute that Interface breached the Revised Sharing Agreement, a valid contract between the parties, by failing to make the True-Up Payment, and that Bear Stearns was damaged in the amount of $1,477,992.  At issue is whether Bear Stearns performed its obligations under the contract.

A fundamental principle of contract law is that a material breach of a contract by one party, which "substantially defeats the purpose of that contract," discharges the further contractual obligations of the non-breaching party.  *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997).  Interface contends that Bear Stearns' antecedent material breaches excused Interface's obligation to make the $1,477,992 True-Up Payment required under the Revised Sharing Agreement.  Specifically, Interface contends that Bear Stearns materially breached the Loan Agreement and the Revised Sharing Agreement by: (1) selling the subordinate component to a competitor, (2) failing to obtain confidentiality agreements to protect Interface's financial information, (3) failing to make a good faith effort to obtain a market price for the subordinate component, and (4) failing to use diligent, good faith efforts to sell the subordinate component subject to the Subordinate Component Restriction.

Bear Stearns now seeks summary judgment on its breach of contract claim.  In its present motion, Bear Stearns argues that it did not breach the contract in any of the ways alleged by

17

Interface, without addressing the issue of materiality.[10]  Bear Stearns' present contention is that even if the alleged breaches were material in nature, it would be entitled to summary judgment if it showed that it did not breach the contract at all.[11]

Interface also moves for summary judgment on Bear Stearns' claim, but Interface's motion stands on somewhat different footing.  To defeat Bear Stearns' breach of contract claim, Interface must show that Bear Stearns *materially* breached the contract (so as to discharge Interface from its obligations under the contract).  Specifically, Interface argues that there are no disputed issues of material fact concerning Bear Stearns' failure to use good faith efforts to obtain a market price for the subordinate component and its failure to use diligent, good faith efforts to sell the subordinate component with the Subordinate Component Restriction, and that those breaches were material.

---

[10] As noted above, the Court rejected Bear Stearns' earlier motion for summary judgment because, *inter alia*, genuine issues of material fact remained as to whether Bear Stearns' alleged failure to make diligent, good faith efforts to sell the subordinate component subject to the Subordinate Component Restriction was a material breach of the contract.  *See Bear Stearns I,* 361 F. Supp. 2d at 295-97.

[11] In support of its motion, Bear Stearns also presents arguments relating to the doctrines of waiver and accord and satisfaction.  Neither doctrine appears applicable to the case at bar. The doctrine of waiver applies where a party, after learning of another party's breach, continues to perform and to accept benefits under a contract without providing notice of the breach to the other party.  *See Nat'l Westminster Bank v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991).  In this case, Interface's acceptance of the reduced Reset Spread set in the Revised Sharing Agreement did not waive its claims for breaches that it learned about subsequently.  The doctrine of accord and satisfaction is also not applicable.  "An accord and satisfaction is an agreement between two parties under which one party accepts a stipulated performance by the other party in discharge of an unresolved obligation by the latter party."  *Stahl Mgmt. Corp. v. Conceptions Unlimited*, 554 F. Supp. 890, 892 (S.D.N.Y. 1983).  The Revised Sharing Agreement modified the contract, but did not discharge all of Bear Stearns' contractual duties upon the reduction of the Reset Spread. Bear Stearns was still required to perform its other obligations under the Loan Agreement and the Revised Sharing Agreement.

### 2.    Interface's Counterclaims

Interface's defenses to Bear Stearns' breach of contract claim also give rise to counterclaims. Specifically, Interface counterclaims that Bear Stearns breached the Loan Agreement and the Revised Sharing Agreement by: (1) selling the subordinate component to a competitor, (2) failing to obtain confidentiality agreements to protect Interface's financial information, (3) failing to make a good faith effort to obtain a market price for the subordinate component, and (4) failing to use diligent, good faith efforts to sell the subordinate component subject to the Subordinate Component Restriction.  In addition, Interface counterclaims that Bear Stearns breached its implied covenant of good faith and fair dealing by pressuring Interface to purchase terrorism insurance.  Bear Stearns moves for summary judgment on each of these counterclaims.

Before addressing the parties' arguments, I first review general principles of contract interpretation under New York law.

### C.    Contract Interpretation under New York Law

The New York Court of Appeals has explained: "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.  The best evidence of what parties to a written agreement intend is what they say in their writing.  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (citations and quotations omitted).  "Where . . . the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence."  *Rainbow v. Swisher*, 72 N.Y.2d 106, 109 (1988).  But "if the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept

19

any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *British Int'l Ins. Co. v. Seguros LA Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003) (citations and quotations omitted).

A contract is ambiguous if its terms are "susceptible to more than one reasonable interpretation." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004); *see also British Int'l Ins. Co. v. Seguros LA Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003) ("An ambiguity exists where the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (citations and quotations omitted).  The New York Court of Appeals has explained: "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion.  Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (citations and quotations omitted).

Under New York law, a contract "should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (citations and quotations omitted).  "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.  Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." *Galli v. Metz*,

973 F.2d 145, 149 (2d Cir. 1992); *see also Columbus Park Corp. v. Dep't of Hous. Pres. & Dev.*,

80 N.Y.2d 19, 31 (1992) ("a construction which makes a contract provision meaningless is contrary

to basic principles of contract interpretation").  In interpreting contract terms, "the entire contract

must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency."

*Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1991) (citations and quotations omitted).

     I now turn to the specific arguments advanced by the parties.

**D.**    **Competitor Restriction**

     Interface claims that Bear Stearns breached the Loan Agreement by selling the subordinate

component to a competitor of Interface.  The Loan Agreement limits Bear Stearns' ability to assign

the loan to a competitor of Interface in Section 10.24, which sets forth the Competitor Restriction,

the Securitization Exemption, and the definition of "Competitor":

> **Section 10.24.**  **<u>Limitations on Lender's Assignment Rights</u>.**  Unless an
> Event of Default shall then exist, Lender shall not consummate an assignment
> or a participation to any Person that then (i) owns or operates (or is an
> Affiliate of a Person that owns or operates) a casino that is located in the
> State of Nevada or the State of New Jersey, (ii) owns or operates (or is an
> Affiliate of a Person that owns or operates) a Competing Facility and /or (iii)
> is a union pension fund (any such Person, a **"<u>Competitor</u>"**) . . . .
> Notwithstanding the foregoing, this Section shall not apply to a Securitization
> of the Loan and shall be void and of no further force and effect after a
> Securitization of the Loan.

July Hoff Aff., Ex. 15, § 10.24.  Interface argues that Bear Stearns breached the Competitor

Restriction by selling the subordinate component to SOF-VI.  In response, Bear Stearns contends

that: (1) the sale of the subordinate component to SOF-VI was a Securitization and hence exempt

from the Competitor Restriction, (2) the Senior Securitization Transaction voided the Competitor

Restriction for the entire loan, and (3) even if the Competitor Restriction did apply, SOF-VI was not

a Competitor at the time of the sale.

**1.      Was the Sale to SOF-VI a "Securitization" Under Section 10.24?**

Section 10.24 states that the Competitor Restriction "shall not apply to a Securitization of the Loan." Bear Stearns contends that the sale of the subordinate component to SOF-VI was a Securitization under the plain text of the contract, and thus exempt from the Competitor Restriction.

Bear Stearns relies on Section 9.1, which set forth the definition of "Securitization,"[12] and defines that term broadly. Section 9.1 states:

> Lender may sell all or any portion of the Loan and Loan Documents, or issue one (1) or more participations therein, or consummate one (1) or more private or public securitizations of rated single- or multi-class securities (the "<u>Securities</u>") secured by or evidencing ownership interests in all or any portion of the Loan and the Loan Documents or a pool of assets that include the Loan and Loan Documents (such sales, participations and/or securitizations, collectively, a "<u>Securitization</u>")

Bear Stearns argues that the sale of the subordinate component to SOF-VI was an issuance of a participation interest in a portion of the loan, and thus a Securitization under this definition.

At first glance, Bear Stearns appears to present a strong plain text argument that the sale to SOF-VI was a Securitization under Section 10.24, based on the explicit definition of that term in Section 9.1. But the definition of Securitization in Section 9.1 is so broad that applying it to Section 10.24 would render the Competitor Restriction meaningless, an interpretation disfavored under New York law. *See, e.g., Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible."). Section 10.24 states that the Competitor Restriction "shall not apply

_____

[12] Section 1.1, the definitions section of the Loan Agreement, states that the term "Securitization" shall have the meaning set forth in Section 9.1.

to a Securitization of the Loan."  If this use of "Securitization" includes any sale, participation, or securitization of all or part of the Loan, it is difficult to see how the Competitor Restriction could *ever* apply.  In other words, if the broad definition of Securitization in Section 9.1 is applied to Section 10.24, the exception (the Securitization Exemption) would completely swallow the rule (the Competitor Restriction).  Such an interpretation must be rejected.[13]

The parties dispute whether the sale to SOF-VI falls within an industry definition of "securitization."  Bear Stearns' expert contends that the subordinate component was only created as a part of the securitization process, and that the sale of the subordinate component was thus part of the overall securitization of the loan.  *See* Affidavit of Scott L.N. Davidson, dated July 28, 2006, Ex. 1 ("Davidson Report"), ¶¶ 18-20.  Interface's expert, on the other hand, argues that the market definition of "securitization" is "a financing technique that establishes a pool of commercial mortgages and creates a series of negotiable instruments (securities) that represent an undivided interest in the mortgages and can be readily traded in the public markets"; thus, Interface's expert contends that the sale of the subordinate component was not a securitization because it did not create securities that could be readily traded in the public markets.  *See* Affidavit of Timothy W. Dwyer, dated March 16, 2007, Ex. 1 ("Dwyer Report"), at 6, 8.

I find that the definition of "Securitization" in Section 10.24 is ambiguous, and that extrinsic evidence may be presented to demonstrate whether the parties intended to include the Subordinate

---

[13] Bear Stearns also points out that the Revised Sharing Agreement refers to disposition costs as "costs of Securitization," which include disposition costs associated with the Subordinate Component Transaction.  This suggests that the definition of "Securitization" in Section 9.1 of the Loan Agreement applies to the disposition cost provisions in the Revised Sharing Agreement.  But it does not change the fact that applying the definition of "Securitization" in Section 9.1 to Section 10.24 would violate basic principles of contract interpretation by rendering the Competitor Restriction meaningless.

Transaction within the meaning of that term. Bear Stearns has failed to meet its burden of showing that there is no genuine issue of material fact as to whether the sale of the subordinate component to SOF-VI was a Securitization under Section 10.24, and thus exempt from the Competitor Restriction.

### 2.    Did the Senior Securitization Transaction Void the Competitor Restriction for the Entire Loan?

The Securitization Exemption in Section 10.24 states that the Competitor Restriction "shall not apply to a Securitization of the Loan and shall be void and of no further force and effect after a Securitization of the Loan." This single sentence contains two distinct parts (the parties' briefs call them "clauses"). The first part says that Section 10.24 "shall not apply to a Securitization of the Loan." The second part says that Section 10.24 "shall be void and of no further force and effect after a Securitization of the Loan." Bear Stearns argues that the second part of the sentence completely voided the Competitor Restriction after the Senior Securitization Transaction, which both parties agree was a Securitization under Section 10.24.

As an initial matter, both parties appear to agree that the phrase "a Securitization of the Loan" refers to a Securitization of *all or a portion* of the loan.[14] The key question then is whether, after a Securitization of a portion of the loan, the second part of the Securitization Exemption voids the Competitor Restriction: (1) for the entire loan, or (2) only for the portion of the loan that was Securitized.

The second part of the Securitization Exemption states that the Competitor Restriction "shall

---

[14] Thus, both parties agree that, under the first part of the Securitization Exemption, the Competitor Restriction does not apply to a Securitization of a portion of the loan (such as the Senior Securitization Transaction).

be void and of no further force and effect after a Securitization of the Loan." Bear Stearns argues that the plain meaning of this text is that the Competitor Restriction is completely voided after any Securitization. The absence of a limiting clause (upon the extent to which the Competitor Restriction is voided) provides some textual support for Bear Stearns' position. For example, the second part does not say that the Competitor Restriction "shall be void and of no further force and effect *upon the portion of the Loan that has been Securitized* after a Securitization of the Loan." Thus, Bear Stearns offers a plausible reading of the text.

But the second part of the Securitization Exemption can also be read as simply voiding the Competitor Restriction for the portion of the loan that has been Securitized. On this reading, the second part of the sentence essentially reiterates, emphasizes, or amplifies the first part of the sentence—and both parts refer only to the portion of the loan that has been Securitized. Furthermore, the phrase "after a Securitization of the Loan" (which both parties understand to mean "after a Securitization of all or part of the Loan") can be interpreted as limiting the scope of the second part of the Securitization Exemption to the part of the loan that has actually been Securitized.[15]

One might argue that this interpretation—that the second part of the sentence essentially reiterates the first part—is disfavored because it renders the second part of the sentence superfluous, contrary to the principle that contracts should be interpreted to give effect to all terms. But there is a significant difference between an interpretation that renders an entire section meaningless (like

---

[15] An example can illustrate this interpretation. Suppose a parent gives allowances to his two children, and states, "I will not give an allowance after a child misbehaves." This sentence can mean that the parent will only withhold allowance from the child who misbehaves. In other words, the phrase "after a child misbehaves" can be understood as limiting the scope of the sentence to the misbehaving child.

applying the definition of "Securitization" in Section 9.1 to Section 10.24) and an interpretation that treats one part of a sentence as reiterating or emphasizing another part of the sentence. In the former situation, the principle that contracts be interpreted to give effect to all terms carries great force because one doubts that parties would have intended to include an entire section in the contract that was meaningless and of no effect. In the latter situation, however, the principle is less compelling because the parties may well have intended for one part of a sentence to reiterate or emphasize another part of the sentence. In addition, the phrase "shall be void and of no further force and effect" is a type of stock phrase—like "will be null and void"—that can be used to reiterate, emphasize, or amplify an earlier part of a sentence.[16]  For these reasons, I find that the plain text of the second part of the Securitization Exemption can also be read as limited to the portion of the loan that has been Securitized.[17]

---

[16] For example, the Revised Sharing Agreement states: "Provided that the Securitization occurs in accordance with the provisions of this letter agreement and provided that the Amendments to the Loan Agreement . . . are executed by Borrower and Lender simultaneously herewith, Lender will have satisfied all of its obligations under that certain post-closing cooperation letter (the 'Post-Closing Cooperation Letter'), . . . and neither Borrower nor Lender shall have any further liability thereunder and the Post-Closing Cooperation Letter will be null and void thereafter."  Schneider Aff., Ex. 16, § 1.  In this example, the clause stating that "the Post-Closing Cooperation Letter will be null and void thereafter" reiterates and amplifies the previous clause stating that "neither Borrower nor Lender shall have any further liability thereunder."

[17] Interface interprets both parts of the Securitization Exemption as limited to the portion of the loan that has been securitized, but argues that the second part of the sentence performs a different function than the first part.  It contends that "the most reasonable interpretation of the Securitization Exemption is that the first clause exempts the initial sale of securities by Bear Stearns (i.e., a securitization) from the Competitor Restriction, and the second clause then voids the Competitor Restriction as applied to later sales of the securities in the open market (i.e., after a securitization)."  Interface Opp'n Br. at 27.  But it is not clear if third-party investors who purchased securities would be bound by the Competitor Restriction in the first place.  The Loan Agreement is a contract between Interface and Bear Stearns, and the Competitor Restriction restricts assignments by the "Lender," Bear Stearns.

Both parties argue that their interpretations are implicitly confirmed by language in the Revised Sharing Agreement, which was entered into just before the Senior Securitization Transaction closed.  Bear Stearns points out that Interface attempted to delete the last sentence of Section 10.24—the Securitization Exemption—during negotiations for the Revised Sharing Agreement, and argues that Interface was motivated to do so because it knew that the Competitor Restriction would be eliminated once the Senior Securitization Transaction closed.  However, it is also possible that Interface wanted to delete the last sentence of Section 10.24 to expand the reach of the Competitor Restriction to prevent the transfer of loan interests to a Competitor even through a Securitization.  Or Interface may have wanted to delete the last sentence of Section 10.24 because the ambiguous definition of "Securitization" threatened to completely undermine the Competitor Restriction.  In support of its own interpretation of Section 10.24, Interface points out that the Revised Sharing Agreement states that "[n]othing contained herein shall be construed to permit Lender to transfer the Loan or any portion thereof in violation of the provisions of Section 10.24 of the Loan Agreement."  Schneider Aff., Ex. 16, § 3.  Interface argues that it would have been pointless to include this sentence in the Revised Sharing Agreement if Section 10.24 was to be completed voided after the Senior Securitization Transaction.  Bear Stearns responds that this sentence reflected the fact that Section 10.24 would continue to apply if the Senior Securitization Transaction fell through and was not completed.

Having considered the text of the contract, I conclude that it is ambiguous whether, after a Securitization of a portion of the loan, the second part of the Securitization Exemption voids the Competitor Restriction for the entire loan, or only for the portion of the loan that has been Securitized.  This provision is susceptible to more than one reasonable interpretation, and extrinsic

27

evidence may be examined to determine what the parties intended.

The parties present conflicting explanations of the intended purpose of the Securitization Exemption.  Bear Stearns argues that the subordinate component had a limited market and was difficult to sell, and that it negotiated the second part of the Securitization Exemption (to completely void the Competitor Restriction after a Securitization) to maintain flexibility in how it could dispose of the loan. Interface, on the other hand, argues that the parties included the Securitization Exemption based on "concerns about tracking and containing sales of securities in the open market" after a securitization, and that this logic would only extend to the portion of the loan that had been securitized.  Interface Opp'n Br. at 27.[18]

In light of the textual ambiguity and the conflicting explanations of the parties' intent, I conclude that Bear Stearns has failed to meet its burden of showing that there is no genuine issue of material fact as to whether the Competitor Restriction was completely voided after the Senior Securitization Transaction.

### 3.       Was SOF-VI a "Competitor" Under Section 10.24?

Bear Stearns argues that, even if it was restricted from selling the subordinate component to a Competitor, it did not breach the Competitor Restriction because SOF-VI was not a Competitor at the time of the Subordinate Transaction.  Section 10.24 defines "Competitor" as follows:

> Lender shall not consummate an assignment or a participation to any Person that then (i) owns or operates (or is an Affiliate of a Person that owns or operates) a casino that is located in the State of Nevada or the State of New

---

[18] Interface also points out that, under Bear Stearns' interpretation, a securitization of a mere one percent of the Loan would void the Competitor Restriction for the other ninety-nine percent of the loan; thus, Interface argues that Bear Stearns' interpretation completely undermines the underlying rationale of the provision and cannot reasonably reflect the parties' intent.

Jersey, (ii) owns or operates (or is an Affiliate of a Person that owns or operates) a Competing Facility and/or (iii) is a union pension fund (any such Person, a "<u>Competitor</u>") . . .

The term "Affiliate" is defined in Section 1.1 of the Loan Agreement: "'<u>Affiliate</u>' shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person."

Interface contends that SOF-VI was a Competitor based on its connections—through Starwood Hotels—with the Westin Casuarina and the Aladdin, which are hotel/casinos located in Las Vegas, Nevada.

SOF-VI is a fund managed by Starwood Capital. At the time of the Subordinate Transaction, Barry S. Sternlicht was President and Chief Executive Officer of Starwood Capital, as well as Chairman and Chief Executive Officer of Starwood Hotels. *See* Interface's Rule 56.1 Statement of Additional Material Facts in Opp'n to Pl.'s Mot. for Summ. J., ¶ 47. Thus, it appears that Starwood Hotels was an Affiliate of SOF-VI because both entities were under the "common control" of Sternlicht. The issue is whether, at the time of the Subordinate Transaction, Starwood Hotels owned or operated a casino in Las Vegas through its relationship with the Westin Casuarina or the Aladdin.

### a.    The Westin Casuarina

The Westin Casuarina is owned and operated by Columbia Sussex, LLC ("Columbia Sussex"), and the attached casino, the Casuarina Casino, is operated by Wimar Tahoe Corp. ("Wimar Tahoe"), an affiliate of Columbia Sussex.

Starwood Hotels has a franchise and license agreement with Columbia Sussex that allows the Westin Casuarina to use the "Westin" brand, which is owned by Starwood Hotels. The license

agreement requires Columbia Sussex to conform with numerous standards and policies established by Starwood Hotels for the Westin Hotels.  The agreement states that Columbia Sussex must "[o]perate the Hotel in strict conformity with the [Westin] Standards and Policies, including all rules, regulations, and policies which are by their terms mandatory" and "shall at all times implement all portions of the [Westin] System in its operation of the Hotel."  July Hoff Aff., Ex. 60, ¶ 6(a).  For example, Columbia Sussex must follow Starwood Hotel's Westin policies related to guest service, the products, goods, and services offered for sale, the television channels and other amenities offered, marketing and service programs, equipment and software, renovations and maintenance, capital expenditures, hours of operation, and personnel training.  *Id.*, ¶ 6.  The agreement allows Starwood Hotels to inspect the premises of the Westin Casuarina to determine compliance with Westin standards and policies.  *Id.*, ¶ 6(k).

However, the license agreement affords Starwood Hotels only very limited involvement with the Casuarina Casino.  The agreement states: "Licensor [Westin/Starwood Hotels] understands the casino will be operated under a casino lease by Wimar Tahoe Corporation, a Nevada Corporation, but other than as provided in Paragraphs 6(a)(viii), 6(k) and 8(a), Licensor has no involvement with the casino operation."  *Id.*, ¶ 2(g).  Paragraph 6(a)(viii) requires coordination of the aesthetics of the casino and the hotel, Paragraph 6(k) states that Starwood Hotels' right to inspect the Casuarina Casino is limited to the public areas, and Paragraph 8(a) states that "Licensee [Columbia Sussex] shall operate the casino under a name which does not include the Licensed Marks and the Licensed Marks shall not be used in advertisements or on the outside or inside of the Hotel in proximity to the name of the casino or with the word casino so as to cause the public to believe the casino is associated with the Westin System."  *Id.*

Based on these facts, it is clear that Starwood Hotels *itself* did not own or operate the casino attached to the Westin Casuarina. Instead, Interface argues that the subordinate component was sold to a Competitor because Starwood Hotels—based on control it exerted through the licensing agreement—was an Affiliate of Columbia Sussex, which owned the Casuarina Casino at the time of the Subordinate Transaction. I reject this argument.

Interface contends that there is a genuine issue of material fact as to whether Starwood Hotels and Columbia Sussex were Affiliates because Columbia Sussex was "controlled" by Starwood Hotels. But the licensing agreement, which requires Columbia Sussex to operate the Westin Casuarina in conformance with standards and policies established by Starwood Hotels, does not show that Starwood Hotels "controlled" Columbia Sussex, as that term is used in the Loan Agreement's definition of "Affiliate." Interface cites *Hilton v. Holiday Inns, Inc.*, 1990 WL 113133 (S.D.N.Y. Aug. 1, 1990), where the court found that Holiday Inns' control over the manner in which its licensee operated the hotel was a factual issue to be determined at trial. *Id.* at *2, *3. But that case involved Holiday Inns' potential vicarious liability for an accident arising out of hotel operations. The present situation is quite different. The concept of "control" in the Loan Agreement's definition of "Affiliate" does not focus on responsibility for hotel policies and operations, as in the *Hilton* case; rather, it relates to the relationship between two entities, and one entity's control *over the other entity*. This broader concept of "control" is illustrated by the implications of Interface's argument. Under Interface's theory, if Starwood Hotels and Columbia Sussex were Affiliates, then Starwood Hotels would be a Competitor if Columbia Sussex owned or operated *any* casino in Nevada—even if Starwood Hotels had no specific involvement with that casino. I conclude that a much more significant degree of control than is established through the

licensing agreement is needed to make Starwood Hotels and Columbia Sussex Affiliates, as there is no evidence that Starwood Hotels controlled the management or general operations of Columbia Sussex as an entity.[19]

### b.    The Aladdin

It is undisputed that the Aladdin was ultimately purchased by a joint venture that included Starwood Hotels.  The issue is whether Starwood Hotels "owned" the Aladdin at the time of the Subordinate Transaction.

The Aladdin filed for bankruptcy on September 28, 2001.  In April 2003, Opbiz, LLP ("Opbiz"), a partnership that included Starwood Hotels, made an offer to purchase the Aladdin in the bankruptcy proceeding.  The Bankruptcy Court approved this offer on June 20, 2003, and on June 23, 2003, OpBiz made a $5 million deposit in connection with the offer.  The purchase agreement, however, provided that the Aladdin transaction was conditioned upon, *inter alia*, certain regulatory consents and approvals—which included approval of a gaming license for the purchasing group by the Nevada Gaming Commission.  *See* July Hoff Aff., Ex. 67, § 7.04.[20]  On August 26, 2004, the

---

[19] Interface's argument is deficient for another reason.  The Competitor Restriction prevents Bear Stearns from assigning the loan to "any Person that then (i) owns or operates (or is an Affiliate of a Person that owns or operates) a casino in Nevada . . . ."  Thus, because the subordinate component was sold to SOF-VI, Interface must show that SOF-VI or an Affiliate *of SOF-VI* owned or operated a casino in Nevada.  Interface contends that SOF-VI is an Affiliate of Starwood Hotels, that Starwood Hotels is an Affiliate of Columbia Sussex, and that Columbia Sussex owns the Casuarina Casino. But the definition of "Competitor" in the Loan Agreement does not encompass multiple degrees of Affiliates.  In other words, it is not sufficient for Interface to create a chain of Affiliations eventually connecting SOF-VI to a casino owner—for example, showing that an Affiliate of an Affiliate of SOF-VI owned or operated a casino in Nevada.  Interface must show that Columbia Sussex is an Affiliate of SOF-VI, but does not attempt to do so.

[20] The sale agreement for the Aladdin conditions the transaction on the purchaser obtaining "[a]ll consents, approvals and actions of, filings with and notices to, any Governmental

Nevada Gaming Commission licensed Opbiz to conduct gaming operations, and Opbiz closed on its purchase of the Aladdin on August 31, 2004.  *See* July Hoff Aff., Ex. 64 ("On August 31, 2004, BH/RE and Opbiz completed the acquisition of substantially all of the real and personal property owned or used by Aladdin Gaming, LLC to operate the Aladdin Resort and Casino . . . .").

The Competitor Restriction in Section 10.24 states that "Lender shall not consummate an assignment or a participation to any Person that *then* (i) owns or operates (or is an Affiliate of a Person that owns or operates) a casino that is located in the State of Nevada . . . ." (emphasis added). The clear import of the adverb "then" is that Bear Stearns may not assign or issue a participation in the loan to a person that owns or operates a casino in Nevada *at the time of* the assignment or participation transaction.  The present issue is whether Starwood Hotels owned the Aladdin at the time of the Subordinate Transaction, which was completed on July 21, 2003.

Interface argues that Starwood Hotels had an ownership interest in the Aladdin by June 2003—a month before the Subordinate Transaction—because the Bankruptcy Court had approved the purchase offer and Opbiz had made a $5 million deposit.  Bear Stearns argues that Bankruptcy Court's approval of the purchase of agreement was merely the first step in the process of acquiring ownership, and that Starwood Hotels did not actually obtain ownership rights in the Aladdin until the purchase transaction closed in August 2004—over one year after the Subordinate Transaction.

The legal concept of "ownership" is generally understood as "[t]he collection of rights allowing one to use and enjoy property, including the right to convey it to others," and to "own" is

_____

or Regulatory Authority (including without limitation, the Gaming Authorities that exercise or will exercise jurisdiction over Purchaser and its Affiliates) necessary to permit Purchaser to perform its obligations under this Agreement and the Operative Agreements and to consummate the transactions contemplated hereby and thereby . . . ."  July Hoff Aff., Ex. 67, § 7.04.

"to have or possess as property; to have legal title to." *Black's Law Dictionary* 1130-31 (7th ed. 1999).[21]  In this case, Opbiz was not entitled to possession of or profits from the Aladdin, and did not obtain legal title to the Aladdin, until the transaction actually closed.  *See* July Hoff Aff., Ex. 67, § 2.04(c) ("At the Closing . . ., Seller will assign and transfer to Purchaser all of the Property and all of Seller's rights, title and interests in, to and under the Transferred Assets [including real property, real property leases, assumed future contracts, inventory, and operating supplies] . . . .").  In addition, Opbiz did not bear responsibility for taxes for the Aladdin until the transaction closed.  *Id.*, §§ 9.01, 9.02.  Furthermore, Opbiz generally could not sell its interest in the Aladdin before the transaction closed.  *Id.*, § 15.08.  Finally, the agreement was subject to numerous termination clauses.  *Id.*, § 14.01.  For these reasons, I conclude that Starwood Hotels was not an "owner" of the Aladdin at the time of the Subordinate Transaction.

Interface also argues that an entity in the process of acquiring ownership in a Nevada casino should be treated as an "owner" because the underlying purpose of the Competitor Restriction was "to prevent potential purchasers of the Loan from gaining a competitive or business advantage from said purchase in relation to Interface" and that "once Starwood Hotels became involved in developing plans for the Aladdin (which they certainly were at least by the time they signed the contract to purchase the Aladdin), information obtained about Interface could be used to Interface's detriment regardless of whether or not the approved contract to purchase the Aladdin had closed."

---

[21] Interface cites several cases holding that a purchaser acquires "equitable title" in property upon execution of a contract.  *See, e.g., Carnavalla v. Ferraro*, 722 N.Y.S.2d 47, 48 (App. Div. 2d Dep't 2001); *Polish Nat'l Alliance v. White Eagle Hall Co.*, 470 N.Y.S.2d 642, 647 (App. Div. 2d Dep't 1983).  However, these cases involve a purchaser's right to redeem a mortgage to prevent foreclosure on the property.  In the case at bar, the parties' use of the term "owns" does not implicate principles of equitable title, which arise under real property law under special circumstances such as foreclosure.

Interface's Opp'n Br. at 37-38.  Although these arguments carry some equitable force, "a court is not free to alter the contract to reflect its personal notions of fairness and equity" when the plain meaning of the contract is clear.  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (citations and quotations omitted).  The contract clearly defines Competitors as entities that "then own" casinos in Nevada—not as entities in the process of acquiring ownership or potential future owners of casinos in Nevada, even if the underlying reasoning behind the provision might apply to those entities as well.[22]  Because that language is clear, the Court must follow it.

Interface also suggests that this result is unfair because it would be "absurd" to "think that you could sign a contract to be a competitor, not have closed on that contract, close the next day, and not fall within this Competitor Restriction."  Def.'s Opp'n Br. at 37.  Interface also notes that "[t]he date of an actual closing is subject to manipulation."  Tr. of Oral Argument, dated February 15, 2007, at 60.

Although I conclude that SOF-VI was not a Competitor under the express terms of the contract, I have previously noted in this case that under New York law, "a party may breach the implied covenant of good faith and fair dealing even if that party's conduct does not contravene the express provisions contained within the four corners of the written agreement."  *Bear Stearns I,* 361 F. Supp. 2d at 298..

Assuming *arguendo* that the Competitor Restriction applied, Bear Stearns might have

---

[22] The difficulty with the broad equitable approach, whereby an analysis of underlying purposes or motives can trump plain text meaning, is that it creates unfair uncertainty for Bear Stearns.  Interface's approach places the Court in the position of assessing whether the process of acquiring ownership is sufficiently underway, or the likelihood of future ownership sufficiently great, that a "non-owner" should be treated as an "owner."  It would be unfair to hold Bear Stearns to that unpredictable assessment when Bear Stearns had negotiated and obtained a clear definition of "Competitor" in the contract.

breached the implied covenant of good faith and fair dealing—even if Bear Stearns did not expressly violate the terms of the contract—if it had intentionally sold the subordinate component to an entity that it knew was about to become a Competitor shortly after the Subordinate Transaction. But there is no evidence that Bear Stearns intentionally undermined the contract by selling the loan to a future competitor because Bear Stearns was not aware of the connections between Starwood Hotels and the Aladdin until *after* the Subordinate Transaction.[23] Furthermore, Starwood Hotels did not become an owner of the Aladdin immediately after the Subordinate Transaction; the Aladdin purchase closed over one year after the Subordinate Transaction. Finally, Bear Stearns might have breached the implied covenant of good faith and fair dealing if it had intentionally manipulated the closing date of Opbiz's Aladdin acquisition so as to evade the Competitor Restriction. But there is no evidence of such manipulation, or that Bear Stearns in fact had *any* control over the timing of the Aladdin transaction.

Therefore, Bear Stearns' sale of the subordinate component to SOF-VI did not violate the Competitor Restriction because Starwood Hotels was not a Competitor at the time of the Subordinate Transaction.

### E.   Confidentiality Agreements

Interface argues that Bear Stearns breached the Loan Agreement by failing to obtain executed confidentiality agreements before releasing financial information of Interface to potential purchasers. The Loan Agreement limits Bear Stearns' ability to share information related to Interface and

---

[23] Interface itself asserts that "Senior Managing Director Reiff and other members of Bear Stearns' Commercial Mortgage Group did not investigate whether SOF-VI's parent Starwood Capital was a Competitor (as defined in the Agreement) until *after* the sale of the Subordinate Component to Starwood Capital's SOF-VI fund in July 2003." Interface's Rule 56.1 Statement of Additional Material Facts in Opp. to Pl.'s Mot. for Summ. J., ¶ 42 (emphasis added).

Adelson in Section 10.25:

> Lender shall not disclose any personal financial information of Sheldon G.
> Adelson.  In connection with any other information delivered to Lender by or
> on behalf of Borrower, Lender shall use commercially reasonable efforts to
> require confidentiality agreements to be signed prior to the release of such
> information; provided, however, Lender shall not have any such obligation
> in connection with a Securitization.

July Hoff Aff., Ex. 15, § 10.25.

Interface contends that Bear Stearns violated Section 10.25 when it provided information on

Interface to prospective purchasers of the subordinate component without first obtaining signed

confidentiality agreements.  Bear Stearns argues that these disclosures did not violate Section 10.25

because: (1) disclosures relating to the Subordinate Transaction were in connection with a

Securitization, and (2) information was provided only to prospective purchasers who signed

confidentiality agreements.

### 1.    Was the Subordinate Transaction a "Securitization" Under Section 10.25?

Section 10.25 states that Bear Stearns does not have an obligation to obtain confidentiality

agreements for Interface's information when such information is provided "in connection with a

Securitization."   July Hoff Aff., Ex. 15, § 10.24.   Bear Stearns argues that the Subordinate

Transaction was a Securitization under Section 10.25 for the same reasons advanced in its discussion

of "Securitization" in Section 10.24.

I once again reject the approach urged by Bear Stearns, which relies on the definition of

Securitization in Section 9.1.   This definition is so broad that applying it to Section 10.25 would

render meaningless the requirement that "Lender shall use commercially reasonable efforts to require

confidentiality agreements to be signed prior to the release of such information," and cause the

exception to completely swallow the rule.

As with Section 10.24, I find that the definition of "Securitization" in Section 10.25 is ambiguous, and that extrinsic evidence may be presented to demonstrate whether the parties intended to include the Subordinate Transaction within the meaning of that term. Bear Stearns has failed to meet its burden of showing that there is no genuine issue of material fact as to whether the sale of the subordinate component was a Securitization under Section 10.25, and thus exempt from the confidentiality requirement.

### 2.     Did Bear Stearns Obtain Confidentiality Agreements?

In addition, Bear Stearns claims that it did in fact obtain confidentiality agreements before providing information to prospective purchasers of the subordinate component. Bear Stearns supports this contention with several pieces of evidence. First, Randy Reiff, the Senior Managing Director at Bear Stearns responsible for marketing and selling the subordinate component, avers that "we obtained signed confidentiality agreements from every prospective purchaser before sending them detailed information regarding the Sands." Affidavit of Randy Reiff, dated July 24, 2006 ("July Reiff Aff."), ¶ 19. Second, Bear Stearns submitted copies of a number of e-mail correspondences in which Bear Stearns sent out a proposed confidentiality agreement for the prospective purchaser to execute. July Reiff Aff., Ex. 2. Third, Bear Stearns provided a copy of one executed confidentiality agreement from Charlesbank Capital Partners ("Charlesbank"). *See* Affidavit of Mitchell E. Hochberg, dated December 6, 2006 ("Hochberg Aff."), Ex. 6.

In response, Interface argues that there is virtually no evidence that the confidentiality agreements were ever signed and returned to Bear Stearns. Aside from the Charlesbank confidentiality agreement, Bear Stearns did not present any other signed, executed confidentiality

agreements.[24]  Bear Stearns claims that the executed confidentiality agreements were obtained, but

not retained.  *See* July Reiff Aff., ¶¶ 19-20.  But Interface points out that it would make little sense

for Bear Stearns to discard the executed confidentiality agreements because they would be necessary

if Bear Stearns ever wanted or needed to enforce the agreements.  Interface also notes that Bear

Stearns did not present transmittal records showing that executed confidentiality agreements were

received.

Thus, Bear Stearns presents some evidence that it sought and obtained confidentiality

agreements; but the near-complete absence of executed, returned documents and transmittal records

permits an inference that Bear Stearns provided information to prospective purchasers without first

obtaining executed confidentiality agreements.[25]  Drawing all reasonable inferences in favor of

Interface, I conclude that Bear Stearns has failed to meet its burden of showing that there is no

genuine issue of material fact as to whether Bear Stearns used commercially reasonable efforts to

---

[24] Furthermore, Interface questions whether the Charlesbank confidentiality agreement actually related to the Subordinate Transaction because the agreement refers to loans "secured by liens on fee simple and leasehold interests in commercial manufactured housing community or multifamily properties."  Hochberg Aff., Ex. 6.

[25] Bear Stearns argues that Interface's contentions are inadequate because "a party cannot rely exclusively on negative inferences to present a genuine issue of material fact."  *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 478 (S.D.N.Y. 2003) (citing *Dowd v. IRS*, 776 F.2d 1083, 1084 (2d Cir. 1985)).  Bear Stearns takes this rule out of context.  In *Dowd*, a Privacy Act action by taxpayers against the IRS where all the knowledgeable IRS witnesses had been deposed and the district court granted the IRS summary judgment, the Second Circuit said: "[The district court] reasoned that, at trial, the Dowds would be forced to rely solely on negative inferences derived from the demeanor of the witnesses.  We have found the vague hope of such negative inferences, standing alone, insufficient to present a triable issue of fact."  776 F.2d at 1084.  The current situation is quite different.  Interface does not rely solely on the "vague hope" that the fact finder at trial would find Reiff's testimony unconvincing.  Rather, because a party would ordinarily retain executed confidentiality agreements, the absence of those documents gives rise to an inference that they were never obtained at all.  This factual inference—although "negative" in some sense—is not inadequate as a matter of law under *Dowd*.

require signed confidentiality agreements before providing information on Interface to prospective purchasers.

### 3.   Materiality and Damages

Interface's contentions with respect to the confidentiality agreements function in two capacities.  First, they act as a defense for Interface to Bear Stearns' breach of contract claim—providing an excuse for Interface's nonpayment of the True-Up Payment.  Second, they form part of the basis for Interface's own breach of contract counterclaims against Bear Stearns.

In the first capacity, Bear Stearns' alleged breach must be material to excuse performance by Interface.  But Bear Stearns' summary judgment motion does not address the issue of materiality.  Therefore, the presence of a genuine issue of material fact on whether Bear Stearns properly obtained confidentiality agreements precludes summary judgment on Bear Stearns' breach of contract claim.

In the second capacity, however, Bear Stearns' alleged breach must have caused damages in order to sustain a valid breach of contract counterclaim for Interface.  *See Lexington 360 Assocs. v. First Union Nat'l Bank*, 651 N.Y.S.2d 490, 492-93 (1st Dep't 1996) ("[i]n the absence of any allegations of fact showing damage, mere allegations of breach of contract are not sufficient to sustain a complaint") (citations omitted).  Interface has failed to present any evidence of actual damages related to confidential information; it argues that the "hidden nature (i.e., buried in the changing private business plans of various third-parties) of these damages has prevented Interface from quantifying them."  Interface's Opp'n Br. at 57.  Interface now suggests that it may be entitled to nominal damages on this issue, *see id.*, but its counterclaims pleaded actual, not nominal, damages, *see* Answer, ¶ 79, ¶ 88.  I find that Interface has not adequately presented evidence of damages, and its counterclaim based on the confidentiality agreements must be dismissed.

### F.    Fair Market Price

Interface contends that Bear Stearns breached the loan agreements by failing to use good faith efforts to obtain a fair market price for the subordinate component.  Under the loan agreements, Bear Stearns was required to "use commercially reasonable efforts to achieve a Securitization which results in the lowest Spread possible."  Schneider Aff., Ex. 3, ¶ 1; Schneider Aff., Ex. 16, ¶ 4. Furthermore, the loan agreement was structured to allow Interface to enjoy a lower interest rate if Bear Stearns could dispose of the loan at an overall spread of less than 400 basis points above LIBOR; in this situation, the implied covenant of good faith and fair dealing required Bear Stearns to make a good faith effort to obtain a fair market price for the subordinate component.

Both parties seek summary judgment on this issue.  Bear Stearns contends that it engaged in extensive efforts to sell the subordinate component and that it obtained a fair market price from SOF-VI.  Interface alleges that Bear Stearns initially held out at an above-market price, and then later accepted a lower bid from SOF-VI without adequately determining if this was a below-market price.

### 1.    Did Bear Stearns Unreasonably Hold Out at an Above-Market Price?

In August 2002, Bear Stearns believed that it had reached an agreement with Beal to sell the subordinate component at a price that reflected a 900 basis point discount margin ("DM")  yield. The Reset Spread in the Revised Sharing Agreement between Bear Stearns and Interface was set based on the assumption that the subordinate component would in fact be sold at this price/yield level.  However, the expected transaction fell through shortly before it was expected to close when Beal refused to complete the transaction at a 900 DM yield.  Beal expressed interest in purchasing the subordinate component at 1250 DM, while Bear Stearns continued to offer the sale to Beal at the 900 DM level rather than attempting to negotiate a compromise price between 900 DM and 1250

41

DM.

Interface contends that it was unreasonable, as a matter of business judgment, for Bear Stearns to continue to market the subordinate component at a 900 DM yield.  Interface argues that "it was over a year after the Loan closed before an entity was found—Beal—that appeared willing to pay the price Bear Stearns was asking (DM of 900)" and that "[t]his lengthy period of time should have suggested to Bear Stearns that perhaps a DM of 900 basis points was not the market price of the Subordinate Component."  Interface Br. at 7-8.  This argument is unconvincing.  The fact that Bear Stearns secured a tentative commitment from Beal at 900 DM is sufficient to show that it was reasonable for Bear Stearns to market the subordinate component at that level.  Moreover, the Revised Sharing Agreement, which set the Reset Spread based on the assumption that the subordinate component would be sold at 900 DM, states: "Borrower [Interface] acknowledges and accepts the Reset Spread, subject to the terms of this letter agreement, and acknowledges that Lender has satisfied its obligation in the Original Sharing Letter to use commercially reasonable efforts to achieve a Final Disposition which results in the lowest Reset Spread possible."  Schneider Aff., Ex. 16, § 4.  Having approved of Bear Stearns' efforts to sell the subordinate component at 900 DM in the Revised Sharing Agreement, Interface cannot now claim that the 900 DM level was unreasonable simply because it took Bear Stearns a year to find a purchaser at that price.

Interface also claims that 900 DM reflected an above-market price because it was higher than what the subordinate component was actually sold for—1265 DM.  Interface argues: "At some point in time, therefore, Bear Stearns must have finally recognized that the market price of the Subordinate Component was less than that reflected by a DM of 900 basis points.  Otherwise, Bear Stearns would have knowingly sold the Subordinate Component at less than the market price."  Interface Br. at 8

42

& n.4.  This argument relies on hindsight, and is completely unconvincing.  The obligation to make good faith or commercially reasonable efforts to obtain a market price does not preclude a seller from marketing a product at a price that proves to be higher than the price ultimately achieved.

More generally, these arguments intrude too greatly upon Bear Stearns' business discretion. A violation of the good faith duty to obtain a fair market price—or to use commercially reasonable efforts to obtain the best price—cannot be established simply by observing, in hindsight, that Bear Stearns could have done something differently that would have produced a better result.  *See D.S. Magazines, Inc. v. Warner Publisher Serv. Inc.*, 640 F. Supp. 1194, 1207 (S.D.N.Y. 1986) ("the question for the Court is not whether [defendant] could have done more or could have performed better, but whether [defendant] performed sufficiently and reasonably well to meet its duty to act in good faith . . .").  Even drawing all reasonable inferences in favor of Interface (as appropriate on Bear Stearns' motion for summary judgment), I conclude that there is no genuine issue of material fact as to whether marketing the subordinate component at 900 DM was unreasonable as a matter of business judgment.

However, Interface also alleges that Bear Stearns' decision to stay at 900 DM with Beal—instead of negotiating a compromise price between 900 DM and 1250 DM—was based on spite towards Beal, rather than legitimate business judgment.  Around August 2002, Beal withdrew from purchase agreements in connection with two other transactions with Bear Stearns, in addition to the Sands loan.  And some evidence suggests that Bear Stearns refused to attempt to negotiate a compromise price with Beal because Bear Stearns was angry with Beal for these last-minute withdrawals.  For example, an internal e-mail from Jim Higgins at Bear Stearns on August 21, 2002 details Beal's last-minute withdrawal from a trade for DMARC bonds, then states: "My Comments:

We offer NO counter to their recent bid on Sands BNote.  Beal Bank should be cut off completely with Bear Stearns – this screw job on the DMARC trade jeopardizes a CDO mandate from Cap Trust that we had in the bag if we completed the DMARC trade."  Schneider Aff., Ex. 19.  Another internal e-mail from Jim Higgins, sent on October 1, 2002, states: "I prefer not to come off our +900 level and 'reward bad behavior.'"[26]  Schneider Aff., Ex. 25.  On the other hand, some evidence indicates that Bear Stearns stayed at 900 DM in an effort to get the best price possible for the subordinate component.  The October 1, 2002 Higgins e-mail advocates offering the Sands loan to Beal at 900 DM "if you [Tom Marano at Bear Stearns] are OK with us carrying the position for another 6-12 months," but states that a trade with Beal at a lower price may be possible "[i]f you [Marano] are anxious to get the position moved."  *Id.*  These statements suggest that Bear Stearns thought it could obtain a price corresponding to 900 DM if Bear Stearns was willing to hold onto the loan for a longer period of time.  In addition, Marano's October 1, 2002 response to the Higgins e-mail states, "Repeat the +900 offer and see what they [Beal] say."  *Id.*  This statement may indicate that staying at 900 DM was a bargaining tactic designed to elicit the best possible price from Beal—rather than an action taken to punish Beal for the withdrawals.  The fact that Beal withdrew from several transactions at the last minute might support an inference that Bear Stearns unreasonably refused to attempt to negotiate a compromise price with Beal because Bear Stearns was embarrassed and angry about Beal's behavior; but the withdrawals could also suggest that Bear Stearns reasonably decided not to expend efforts negotiating a compromise price with Beal because

---

[26] In this e-mail, Higgins also states that one possible response to Beal's inquiries about the Sands loan is to "[t]ell them [Beal] to go f*** themselves."  Schneider Aff., Ex. 25.  Higgins does not advocate actually making this rude rejoinder, but the fact that it is included in the e-mail suggests anger towards Beal for its withdrawals.

Beal's unreliable conduct undermined the potential value of such negotiations.  Under these circumstances, I conclude that there is a genuine issue of material fact as to whether Bear Stearns' decision to stay at 900 DM rather than attempting to negotiate a compromise price with Beal between 900 DM and 1250 DM was based on: (1) good faith business judgment, or (2) Bear Stearns' spite towards Beal, which unreasonably compromised Bear Stearns' efforts to obtain a fair market price for Interface.

**2.     Was the Sale to SOF-VI at a Below-Market Price?**

Interface began discussions with Starwood Capital about the subordinate component in April and May 2003, and the parties negotiated the terms of the sale throughout June and July 2003.  On July 21, 2003, Bear Stearns sold the subordinate component to SOF-VI, a fund managed by Starwood Capital, at a price of 94.97% of par.  This price reflected a yield of 1265 DM, assuming no extension of the initial maturity date of the Loan.

Interface argues that Bear Stearns made insufficient efforts to determine if the 1265 DM level offered by SOF-VI was a below-market price.  In particular, Interface contends that Bear Stearns should have checked with previously interested prospective purchasers to see if they would have paid a higher price than Starwood.[27]  Interface argues:

> There can be no doubt that a reasonable person would be justified in understanding that Bear Stearns would spend half-an-hour during May or early June 2003 to check with previously interested prospective purchasers

---

[27] Bear Stearns explains that, once it had reached an agreement in principle with Starwood, it would have been inappropriate and unprofessional to "shop the bid" to other potential purchasers to seek a better price.  Such conduct could have jeopardized the agreement with Starwood.  *See* Bear Stearns' Opp'n Br. at 29-31.  In response, Interface asserts that Bear Stearns should have checked with other potential purchasers after it had a sense of Starwood's price, but before it reached an agreement in principle with Starwood on the final price.  *See* Interface's Reply Br. at 6-7.

to ensure that the price range Starwood was willing to purchase the Subordinate Component at was a market price, and consequently, that Bear Stearns never checked violated its obligation to make a good faith effort to obtain a market price.

Interface Reply Br. at 7.  However, Reiff, the Senior Managing Director at Bear Stearns in charge

of marketing and selling the Sands loan, represents that:

> Of the more than 50 potential purchasers Bear Stearns solicited to purchase the Subordinate Component all, but three, had no interest in pursuing serious diligence in connection with the Subordinate Component, and, to the extent any interest was expressed on a preliminary basis, it was only at price levels that Bear Stearns reasonably determined were unacceptably low.

July Reiff Aff., ¶ 22; see also Nov. Reiff Aff., ¶¶ 7-8.[28]  In addition, Reiff states:

> Throughout May and June 2003, Bear Stearns had on-going discussions with Starwood Capital regarding the price/yield level for the sale of the Subordinate Component.  During this time, Bear Stearns was still marketing the Subordinate Component to other potential investors; however, no potential investor expressed an indication to purchase the Subordinate Component within the price/yield level range that Starwood Capital was willing to consider to purchase the Subordinate Component.  Nor was any other potential investor willing to commit to a firm bid to purchase the Subordinate Component.

November Reiff Aff., ¶ 27.

Thus, Bear Stearns represents that it marketed the subordinate component to numerous

potential investors through June 2003, but that around that time no other investors—besides

Starwood Capital—had indicated any serious interest in the loan, or interest at a reasonable price.[29]

---

[28] Reiff states that the three potential purchasers seriously interested in the subordinate component were FSL Group, Inc. ("FSL"), Beal, and Starwood Capital.  FSL was interested in purchasing a subordinate component of approximately $80 million, much larger than the approximately $34 million that the subordinate component was ultimately sized at.  In addition, FSL withdrew from discussions on the subordinate component after 9/11.  Nov. Reiff Aff., § 23.

[29] In addition, Reiff describes how several potential investors—Walton Street Capital, LLC, Vornado Realty Trust, Newbridge Realty Group, Archon Corp., and CharlesBank Capital

Interface offers no direct evidence to undermine these representations, but rather argues that these assertions in Reiff's affidavits should not be credited.  Interface emphasizes that Reiff has not produced supporting documentary evidence from his trading notebooks (in which he sometimes took notes from telephone conversations) to show that he interacted with potential purchasers in the manner that he describes.[30]  In my earlier analysis of confidentiality agreements, I noted that because a party would ordinarily retain executed confidentiality agreements, the absence of those documents gives rise to an inference that they were never obtained at all.  The present situation, however, is quite different.  One would expect a party to retain executed confidentiality agreements because those documents would be need to actually enforce the agreements.  But there is no reason to expect that Reiff would take or retain notes from discussions with parties that did not express any serious interest in the Sands loan.  Such notes would not have served any useful purpose.  Consequently, the absence of these notebooks (or of references to such discussions in the notebooks) does not create an inference that Reiff never had such discussions with potential purchasers.[31]  Since no other prospective purchasers were seriously interested in the subordinate component at a reasonable price, the good faith duty to obtain a market price did not require that Bear Stearns to call up these prospective purchasers to see if they would propose a better price than Starwood.

_____

Partners—expressed preliminary interest in the subordinate loan but ultimately withdrew from any potential transaction.  *See* Nov. Reiff Aff., ¶¶ 9-13.

[30] Reiff represents that old trading notebooks had been discarded, and that he did not find any notes relating to the Sands loan in his existing trading notebooks.  *See* Nov. Reiff Aff., ¶¶ 37-39.

[31] Furthermore, general accusations that Reiff's representations are simply untrustworthy are not sufficient to create a genuine issue of material fact.  *See Dowd,* 776 F.2d at 1084.

### 3.    Comparison of SOF-VI and Beal Yield Levels

Finally, I discuss certain comparisons between the 1265 DM yield level agreed to by SOF-VI and yield levels involved in the Beal negotiations.  Around August 2002, Bear Stearns believed that Beal had agreed to purchase the subordinate component at a price corresponding to a yield of 900 DM.[32]   Beal withdrew from the proposed transaction at 900 DM, but offered to purchase the subordinate component at 1250 DM.  *See* Schneider Aff., Ex.18 (referring to "the 1250 they [Beal] have on the table"); Schneider Aff., Ex. 21 (Higgins e-mail refers to "their [Beal's] +1250 bid"). Interface at one point asserts that "Beal counter-offered with a 1250 bp DM, a price more favorable to Bear Stearns and Interface than the 1265 bp DM that Bear Stearns ultimately sold the Subordinate Component for to Starwood Capital."  Interface Opp'n Br. at 13.  This claim—that the 1250 DM offer from Beal was a better price than the 1265 DM level from SOF-VI—appears to be based on a flawed analysis of yield levels.

Bear Stearns explains that, in general, a yield level must be understood in reference to assumptions about the term or maturity date of the loan because it is important to consider the period of time during which that yield level will generate cash flows.[33]   Thus, if one compares two yield levels with the same assumed maturity date, then a lower yield level (such as 1250) corresponds to a better price for Interface than a higher yield level (such as 1265).  If, however, the yield levels include different assumptions about the maturity date, then it is possible that a numerically lower

---

[32] Bear Stearns structured the securitization transaction so that the 900 DM yield level was indifferent to the maturity date of the loan.  *See* July Reiff Aff., ¶ 24.

[33] As noted above, the securitization transaction was specifically designed so that it would be possible to produce a yield level of 900 DM irrespective of the maturity date; but the expected maturity date of the loan would be needed to understand all other yield levels.

yield level (such as 1250) could actually correspond to a *worse* price for Interface than a numerically higher yield level (such as 1265)—and that appears to be the case here.  The October 1, 2002 Higgins e-mail, which refers to "their [Beal's] +1250 bid," later includes a parenthetical comment stating that "100bps is worth approx $1mm."  Schneider Aff., Ex. 21.  Bear Stearns explains that, "[i]n October 2002, as a mathematical fact, the only Loan maturity scenario in which 100 basis points (bps) can be worth approximately $1 million is a scenario where the Loan is extended by two years."  Nov. Reiff Aff., ¶ 24.  Thus, Beal's 1250 DM bid appears to have assumed a two year extension of the maturity date of the loan,[34] whereas the 1265 DM level with Interface assumed no extension of the maturity date of the loan.  If the 1250 DM Beal bid is converted into a yield level assuming no extension of the maturity date of the loan, it becomes greater than 1348 DM[35]—a yield level which is significantly less favorable to Interface than the 1265 DM achieved with SOF-VI.  Based on Bear Stearns' calculations, a 1250 DM assuming a two year extension implies a price of less than 90.49%

---

[34] The parenthetical comment appears directly after mention of 1000 and 1150 DM, but likely also applies to the 1250 DM figure mentioned in the e-mail.  In the e-mail, Higgins refers to Beal's 1250 DM bid, then later states "[i]f you are anxious to get the position moved, my sense is that there is a trade to do with Beal somewhere between +1000 and +1150 (100bps is worth approx $1mm)."  Schneider Aff., Ex. 21.  The "100 bps is worth approx $1mm," which assumes a two year extension of the maturity date, likely applies to the 1250 DM figure as well as the 1000 and 1150 figures because 1150 DM assuming a two year extension is more favorable to Interface and Bear Stearns than 1250 DM assuming no extension.  By way of illustration, it would make sense for someone to say, "They are offering to buy our product for $100, but my sense is that we might be able to sell it to them for $120-$140," but it would not make as much sense for someone to say, "They are offering to buy our product for $100, but my sense is that we might be able to sell it to them for $90-$110."  To assume that the "100bps" parenthetical did not apply to the 1250 DM figure would appear to place the latter construction upon Higgins' statement.

[35] Bear Stearns' expert calculates that an 1150 DM yield assuming a two year extension of the maturity date of the loan corresponds with a 1348 DM yield assuming no extension of the maturity date of the loan.  Thus, a 1250 DM yield assuming a two year extension must correspond with a yield level even greater than 1348 DM assuming no extension.

of par—a price level significantly less favorable than the 94.97% of par price level ultimately paid by SOF-VI.[36]

These calculations show that, when assumptions about the maturity date are properly taken into account, the 1250 DM bid from Beal appears to have been significantly less favorable to Interface than the 1265 DM level agreed to by SOF-VI.  In November 2002, Beal proposed a possible purchase of the subordinate component at a price level of 90% of par (with an added condition of a 90-day exclusive period of review).  This proposal was  significantly less favorable to Interface than the 94.97% of par price paid by SOF-VI.  Thus, the evidence does not support the claim that the price paid by SOF-VI was less favorable to Interface than any price actually offered by Beal (after Beal withdrew from the original 900 DM agreement).

Interface also focuses on Higgins' statement, in his October 1, 2002 e-mail, that "[i]f you are anxious to get the position moved, my sense is that there is a trade to do with Beal somewhere between +1000 and +1150 (100bps is worth approx $1mm)."  Schneider Aff., Ex. 21.  Initially, Interface argued that any sale in this range would have been far more favorable to Interface than the 1265 DM achieved with SOF-VI.  Again, this argument did not properly account for the fact that Higgins' DM figures assumed a two year extension of the maturity date of the loan.  Bear Stearns' expert explains that an 1150 DM assuming a two year extension equates to a yield level of approximately 1348 assuming no extension; a 1075 DM assuming a two year extension equates to 1211 DM assuming no extension; and a 1000 DM assuming a two year extension equates to 1077

---

[36] Once again, Bear Stearns' expert calculates that an 1150 DM assuming a two year extension of the maturity date of the loan corresponds with a price of 90.49% of par.  Thus, a 1250 DM yield assuming a two year extension must correspond with a price less than 90.49% of par (because yield level and percentage of par are inversely related).

DM assuming no extension.  Thus, after properly adjusting for assumptions about the maturity date, the upper portion of the range identified by Higgins corresponds to a yield less favorable to Interface than the yield achieved from SOF-VI, while the middle and bottom part of the range identified by Higgins corresponds to a yield more favorable to Interface than what was achieved with SOF-VI.[37] However, I do not believe the mere possibility of a better price, as suggested in Higgins' internal e-mail, is itself sufficient to show that Bear Stearns violated its duty of good faith to obtain a fair market price.  *See D.S. Magazines, Inc. v. Warner Publisher Serv. Inc.*, 640 F. Supp. 1194, 1204-05 (S.D.N.Y. 1986) ("the question for the Court is not whether [defendant] could have done more or could have performed better, but whether [defendant] performed sufficiently and reasonably well to meet its duty to act in good faith . . .").  The duty of good faith did not necessarily require that Bear Stearns actually achieve the best price that possibly could have been achieved.  This would not be a duty of good faith, but rather a duty of optimal performance.

However, as described in the preceding section, Bear Stearns did have an obligation to use good faith efforts to achieve the best price, and there is a genuine issue of material fact as to whether Bear Stearns' decision to not attempt to negotiate a compromise price with Beal was based on legitimate business judgment, or motivated by spite towards Beal.  In the latter situation, for Beal's counterclaim, there is an additional question as to whether Bear Stearns' breach actually damaged Interface.  Higgins' internal e-mail suggests that, if Bear Stearns had negotiated with Beal, it might have been possible to sell the subordinate component at a better price than was ultimately paid by SOF-VI (if Bear Stearns had been able to achieve a sale at a price in the middle or bottom part of the

---

[37] In other words, the price/yield Bear Stearns obtained from SOF-VI appears to fall within the 1000 DM to 1150 DM range suggested by Higgins in his October 1, 2002 e-mail, when appropriate assumptions about maturity date are taken into account.

range estimated by Higgins).  Although Higgins' estimate is somewhat speculative, drawing all reasonable inferences in favor of Interface (on Bear Stearns' motion for summary judgment), I find there is a sufficient possibility that Bear Stearns' refusal to attempt to negotiate with Beal damaged Interface so as to render summary disposition on this issue inappropriate.

To summarize my conclusions on the fair market value arguments, I find that there is a genuine issue of material fact as to whether Bear Stearns' decision to stay at 900 DM rather than attempting to negotiate a compromise price with Beal between 900 DM and 1250 DM was based on: (1) good faith business judgment, or (2) Bear Stearns' spite towards Beal, which unreasonably compromised Bear Stearns' efforts to obtain a fair market price for Interface.  If the latter, there is an additional genuine issue of material fact on Interface's counterclaim as to whether Bear Stearns' failure to attempt to negotiate a compromise price with Beal actually damaged Interface.[38]  For these reasons, neither party is entitled to summary judgment on the fair market value issue.

## G.    Subordinate Component Restriction

### 1.    Breach of Contract

Interface argues that Bear Stearns breached the loan agreements by failing to make diligent, good faith efforts to restrict the purchaser of the subordinate component from selling the loan to a competitor of Interface.  The Revised Sharing Agreement states at ¶ 3:

> Lender shall in good faith use diligent efforts to market and sell the Subordinate Component subject to the Subordinate Component Restriction provided that Lender reasonably determines (such determination to be made

---

[38] If Bear Stearns' failure to attempt to negotiate a compromise price with Beal was based on legitimate business reasons, then the issue of whether Bear Stearns might have achieved a better price with Beal than it did with SOF-VI is no longer material to the case.  As explained above, the mere possibility that Bear Stearns might have been able to achieve a better price does not establish a violation of the good faith duty to obtain a market price.

in its sole discretion, made in good faith) that selling the Subordinate Component subject to the Subordinate Component Restriction will not adversely affect Lender's ability to sell or otherwise dispose of 100% of Lender's interest in the Loan.

Interface argues that Bear Stearns breached this requirement by: (1) helping to draft the correspondence used by Starwood Capital to reject the Subordinate Component Restriction,[39] (2) failing to aggressively negotiate or make concessions with Starwood Capital to convince it to accept the Subordinate Component Restriction, and (3) failing to check whether other entities interested in the Subordinate Component would be willing to accept the Subordinate Component Restriction. Thus, Interface contends that Bear Stearns' efforts were neither in "good faith" nor "diligent."

Bear Stearns argues that it used good faith efforts to sell the subordinate component subject to the Subordinate Component Restriction by including the restriction in a draft assignment agreement presented to Starwood Capital and attempting to have Starwood Capital accept the restriction during negotiations, but that Starwood Capital refused. In light of the limited market interest in the subordinate component and Starwood Capital's refusal to accept the Subordinate Component Restriction, Bear Stearns argues further that it reasonably determined that the Subordinate Component Restriction would adversely affect its ability to dispose of the loan.

The subordinate component restriction provision in the Revised Sharing Agreement must be read in conjunction with Bear Stearns' obligation to make good faith efforts to obtain a market price,

_____

[39] In particular, Interface notes that Bear Stearns' attorney sent Starwood Capital draft language to use to reject the Subordinate Component Restriction (and subsequently suggested revisions to the language used by Starwood Capital to reject the Subordinate Component Restriction). Interface characterizes these e-mails as Bear Stearns "helping" Starwood Capital reject the Subordinate Component Restriction, while Bear Stearns contends that it was simply obtaining clear, written confirmation of Starwood Capital's refusal to accept the Subordinate Component Restriction.

and around June 2003 no potential investors besides Starwood Capital had expressed serious interest in purchasing the subordinate component at a reasonable price.[40]  Thus, for the same reasons that Bear Stearns was not required to contact potential investors to see if they would propose a better price than Starwood Capital, Bear Stearns was not required to contact potential investors to see if they would agree to the Subordinate Component Restriction.[41]  I therefore focus on whether Bear Stearns made good faith efforts to determine if Starwood Capital would accept the Subordinate Component Restriction.

Bear Stearns asked Starwood Capital to accept the restriction, and Starwood Capital refused; but there are some questions as to whether Bear Stearns made sufficient good faith efforts to persuade and negotiate with Starwood Capital about the restriction.  For example, Bear Stearns did not appear to offer any concessions in exchange for accepting the restriction.  Moreover, it is unclear how firmly Bear Stearns insisted on the restriction.  In a series of e-mail exchanges, Bear Stearns' attorneys drafted the language that Starwood Capital used to reject the restriction.  These e-mails could be interpreted as simply obtaining written confirmation of Starwood Capital's position, but they could also be seen as facilitating Starwood Capital's rejection (rather than pushing against it). Drawing all reasonable inferences in favor of Interface (on Bear Stearns' motion for summary judgment), I conclude that there is a genuine issue of material fact as to whether Bear Stearns made sufficient good faith efforts to persuade Starwood Capital to accept the Subordinate Component

---

[40] Beal continued to express some interest in the subordinate component, but offered a price of 90% of par, which Bear Stearns considered to be unreasonably low.

[41] In other words, there would have been no point in Bear Stearns determining whether a purchaser would agree to the Subordinate Component Restriction unless that purchaser had a serious interest in purchasing the subordinate component at a reasonable price.

Restriction, and to determine if Starwood Capital would do so.

Interface is not entitled to summary judgment on this issue either.  Drawing all reasonable inferences in favor of Bear Stearns, a reasonable fact finder could conclude that Bear Stearns used good faith efforts by including the restriction in a draft assignment agreement and attempting to have Starwood Capital accept the restriction during negotiations; that the e-mails from Bear Stearns' attorneys were simply attempts to obtain a clear written record of Starwood Capital's refusal to accept the Subordinate Component Restriction; and that Bear Stearns made a reasonable, good faith determination that the restriction would adversely affect its ability to dispose of the loan.

### 2.    Materiality and Damages

As discussed earlier in the context of confidentiality agreements, Interface's contentions with respect to the Subordinate Component Restriction function in two capacities.  First, they act as a defense for Interface to Bear Stearns' breach of contract claim—providing an excuse for Interface's nonpayment of the True-Up Payment.  Second, they form part of the basis for Interface's own breach of contract counterclaims against Bear Stearns.

In the first capacity, Bear Stearns' alleged breach must be material to excuse performance by Interface.  I have previously held that the materiality of Bear Stearns' alleged failure to market the subordinate component with the Subordinate Component Restriction was a fact-intensive question that could not be resolved on Bear Stearns' previous motion for summary judgment, *see Bear Stearns I,* 361 F. Supp. 2d at 295-97, and Bear Stearns has not revisited that materiality issue on their present motion.

In the second capacity, however, Bear Stearns' alleged breach must have caused damages in order to sustain a valid breach of contract counterclaim for Interface.  *See Lexington 360 Assocs. v.*

*First Union Nat'l Bank*, 651 N.Y.S.2d 490, 492-93 (1st Dep't 1996) ("[i]n the absence of any allegations of fact showing damage, mere allegations of breach of contract are not sufficient to sustain a complaint") (citations omitted).  Interface has failed to present any evidence of damages, because Starwood Capital never sold or assigned the subordinate component—let alone to a competitor of Interface.[42]  Thus, Interface's breach of contract counterclaim must be dismissed to the extent that it is based on Bear Stearns' failure to subject Starwood Capital to the Subordinate Component Restriction.

## H.    Terrorism Insurance

Interface argues that Bear Stearns breached the implied covenant of good faith and fair dealing by improperly pressuring Interface to purchase terrorism insurance.  This claim arises out of Bear Stearns' May 16, 2002 letter informing Interface that it was required to purchase terrorism insurance under the terms of the Loan Agreement and that failure to purchase such insurance would constitute a default under the Loan Agreement.  Interface argues that terrorism insurance was not required under the Loan Agreement, and that Bear Stearns demanded the insurance in retaliation for being removed from and kept out of the Venetian refinancing.

Under Section 6.1(a)(I) of the Loan Agreement, Interface was obligated to maintain "all risk" insurance for the Sands.  Section 6.1 also required Interface to obtain "upon sixty days written notice, such other reasonable insurance . . ., and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is

---

[42] Interface itself states that "there is no evidence that Starwood intended to sell the Subordinate Component as opposed to holding it to maturity, which it did."  Interface's Reply Br. at 11-12.

located." July Hoff Aff., Ex. 15, § 6.1(a)(ix).

### 1.      Causation

Bear Stearns argues that the claim must fail because Interface purchased terrorism insurance for the Sands in response to the demands of another lender, Goldman Sachs, in connection with the Shops Mall Loan—not due to Bear Stearns' demands related to the Sands loan.  In support, Bear Stearns notes that Interface had purchased $200 million in blanket terrorism coverage for the Venetian properties *before* the May 16, 2002 demand letter from Bear Stearns.  Indeed, this insurance appears to have been purchased in response to Goldman Sachs' requests.  However, Interface purchased an additional $45 million in terrorism insurance coverage on May 23, 2002 and an additional $11.5 million on June 28, 2002.  Interface contends that this additional $56.5 million was in response to Bear Stearns' demands, and the timing of the purchases is consistent with this explanation.  Furthermore, it does not appear that Goldman Sachs ever requested more than $200 million in terrorism insurance coverage.  Thus, Bear Stearns has not established that its demands did not cause Interface to purchase any terrorism insurance.

### 2.      Did Bear Stearns Have a Contractual Right to Request Terrorism Insurance?

Under New York law, "no obligation [of good faith and fair dealing] can be implied which would be inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304; *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.2d 158, 169 (2d Cir. 2004).  In other words, a party's exercise of contractual rights does not breach the implied covenant of good faith and fair dealing.  *See, e.g., Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y. 1991) ("The parties' contractual rights and liabilities may not be varied, nor their terms eviscerated, by a claim that one party has exercised a contractual right but has

failed to do so in good faith."); *Downtown Athletic Club of New York City, Inc. v. Caspi Dev. Corp.*, 1998 WL 898226, *10 (Bankr. S.D.N.Y. Dec. 21, 1998) ("A party can exercise its rights under a contract for any reason it finds satisfactory, and such act will not constitute a breach of the implied covenant of good faith and fair dealing.").  In the case at bar, I consider whether Bear Stearns had an express right to demand that Interface purchase terrorism insurance.

The provision in the Loan Agreement requiring Interface to maintain "all risk" insurance did not permit Bear Stearns to demand terrorism insurance.  Prior to 9/11, Interface's "all risk" policy covered damage due to acts of terrorism; but such damage was excluded from coverage when Interface renewed its "all risk" insurance policy after 9/11.  Section 6.1(a)(i) of the Loan Agreement merely required Interface to maintain "all risk" insurance—it did not require Interface to maintain coverage for every type of risk that had been covered by the initial "all risk" policy.  *See Omni Berkshire Corp. v. Wells Fargo Bank, N.A.*, 307 F. Supp. 2d 534, 541 (S.D.N.Y. 2004).

But Section 6.1 also permitted Bear Stearns to request that Interface purchase "such other reasonable insurance . . ., and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located." July Hoff Aff., Ex. 15, § 6.1(a)(ix).[43]  The parties dispute the extent to which other lenders

---

[43] The provision requires Interface to obtain such reasonably requested insurance upon sixty days written notice.  Interface argues that this provision is simply irrelevant because Bear Stearns never gave sixty days notice.  *See* Interface's Resp. to Pl.'s Statement of Undisputed Material Facts, ¶ 134.  Interface's objection is misplaced.  Under the provision, Interface would not be in default unless it failed to purchase the reasonably requested insurance upon sixty days written notice.  But Bear Stearns never actually called a default or took enforcement action against Interface; rather, the issue is whether Bear Stearns had a contractual right to request that Interface purchase terrorism insurance.  The provision clearly indicates that Bear Stearns had the right to request certain types of reasonable insurance for commonly insured against hazards.

required terrorism insurance for mortgaged properties.  Bear Stearns notes that Goldman Sachs required terrorism insurance for the Shops Mall property, but Interface generally disputes the extent to which the Sands and Las Vegas were high-risk terrorism targets.  *See* Bear Stearns' Statement of Undisputed Material Facts, ¶¶ 139-46; Interface's Resp. to Pl.'s Statement of Undisputed Material Facts, ¶¶ 139-46.  I conclude that there is a genuine issue of material fact as to whether terrorism insurance was commonly insured against for property similar to the Sands located around the Las Vegas area.

### 3.    Bad Faith

Finally, if Bear Stearns did not have an express contractual right to demand terrorism insurance, the parties dispute whether Bear Stearns acted in the honest belief that terrorism insurance was required under the Loan Agreement or in bad faith retaliation against Interface.  Interface emphasizes that the May 16, 2002 demand letter was sent one day after the telephone conversation during which Adelson refused to reinstate Bear Stearns to the Venetian refinancing, and during which Interface claims that Cayne threatened to retaliate against Interface.  Bear Stearns contends that it reasonably believed that terrorism insurance was required by the contract, that it held off from demanding the insurance in an attempt to bolster its business relationship with Interface, and that it reasonably dealt with Interface on an arms length basis after Adelson refused to reinstate Bear Stearns to the Venetian refinancing on May 15, 2002.  Based on these conflicting accounts, there is a clearly a genuine issue of material fact as to whether Bear Stearns demanded that Interface purchase terrorism insurance in good faith based on a reasonable interpretation of the contract, or in bad faith retaliation against Interface for removing Bear Stearns from the Venetian refinancing.

### III.  CONCLUSION

For the foregoing reasons, Bear Stearns' motion for summary judgment is granted in part and denied in part.  On its breach of contract claim, Bear Stearns is entitled to summary judgment on the issue of whether it breached the Competitor Restriction by selling the subordinate component to SOF-VI.  Bear Stearns is also entitled to summary judgment on the fair market price issue, *except* that the motion is denied as to the specific issue of whether Bear Stearns breached its good faith obligation to obtain a market price for the subordinate component by unreasonably, and in bad faith, refusing to negotiate a compromise price with Beal.  Bear Stearns' motion for summary judgment on its breach of contract claim is also denied as to the following issues: (1) whether Bear Stearns breached the contract by failing to obtain confidentiality agreements before providing information on Interface to prospective purchasers; and (2) whether Bear Stearns breached the contract by failing to make good faith efforts to sell the subordinate component subject to the Subordinate Component Restriction.

As to Interface's breach of contract counterclaims, Bear Stearns' motion for summary judgment is granted on the following issues: (1) Bear Stearns' alleged breach of the Competitor Restriction by selling the subordinate component to SOF-VI; (2) Bear Stearns' failure to obtain confidentiality agreements; and (3) Bear Stearns' failure to make good faith efforts to sell the subordinate component subject to the Subordinate Component Restriction.  Bear Stearns is also entitled to summary judgment on the fair market price issue, *except* that the motion is denied as to the specific issues of whether Bear Stearns breached its good faith obligation to obtain a market price for the subordinate component by unreasonably, and in bad faith, refusing to negotiate a compromise price with Beal, and if so, whether such a breach caused damages to Interface.  Bear Stearns' motion

for summary judgment on Interface's counterclaims is also denied on the issue of whether Bear Stearns breached its duty of good faith by demanding that Interface purchase terrorism insurance.

Interface's motion for summary judgment on Bear Stearns' breach of contract claim is denied in all respects.

It is apparent that these motions for summary judgment were preceded by extensive pre-trial discovery. The question arises as to whether the case is now trial ready with respect to the issues that remain for trial in the light of this Opinion and Order.

Counsel are directed to address that question by sending letters to the Court, with copies to each other, giving their perceptions of the present status of the case. In particular, counsel are directed to specify what discovery, if any, remains to be conducted with respect to any isssues remaining for trial. Counsel should also give estimates of the amount of trial time their cases in chief will require. These letters must be filed and exchanged not later than August 1, 2007. These exchanges will facilitate the eventual entry by the Court of a Final Pre-Trial Order and the setting of a firm date for trial.

Lastly, counsel are reminded of their continuing obligation to consider and advise their clients with respect to a settlement of the case short of trial. This reminder is not really necessary, because counsel for both parties have demonstrated a high level of professionalism.

The foregoing is SO ORDERED.

Dated: New York, New York
July 9, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

61